UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                                   Chapter 11

VORAS ENTERPRISE INC.,                                   Case No. 1-17-45570 (NHL)

        Debtor.

-----------------------------------------------------------x

## DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

Dated:  January 24, 2018

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Tel: (212) 682-4940
Fax: (212) 682-4942
Allen G. Kadish
Harrison H.D. Breakstone
Email: akadish@dtklawgroup.com
hbreakstone@dtklawgroup.com

*Counsel for Voras Enterprise Inc.,*
*Debtor and Debtor-in-Possession*

## DISCLAIMER PURSUANT TO LBR 3017-1(b)

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION .................................................................................................. 2

   1.1.  Purpose of this Document ............................................................................. 2

   1.2.  Confirmation Procedures .............................................................................. 3

      (a)  Persons Potentially Eligible to Vote on the Plan ............................. 3

      (b)  Who May Vote to Accept/Reject the Plan ....................................... 4

      (c)  What is an Allowed Claim ................................................................ 4

      (d)  What is an Impaired Claim ............................................................... 4

      (e)  Who is Not Eligible to Vote ............................................................. 4

      (f)  Time and Place of the Confirmation Hearing .................................. 5

      (g)  Deadline for Voting For or Against the Plan ................................... 5

      (h)  Who May Object to Confirmation of the Plan ................................. 5

      (i)  Deadline for Objecting to Confirmation of the Plan ........................ 5

   1.3.  Disclaimer ..................................................................................................... 5

II.  BACKGROUND ................................................................................................... 6

   2.1.  Description and History of the Debtors' Businesses ..................................... 6

   2.2.  The Debtor's Secured Creditors .................................................................... 7

      (a)  MTAG Secured Claim ..................................................................... 7

      (b)  124 NY Secured Claim ..................................................................... 7

   2.3.  Events Leading to Chapter 11 ....................................................................... 7

III. THE PLAN ............................................................................................................ 8

   3.1.  Confirmation of the Plan ............................................................................. 10

IV. SIGNIFICANT EVENTS IN THE CASE ......................................................... 11

   4.1.  Professional Retentions .............................................................................. 11

   4.2.  Motions and Actions ................................................................................... 11

    4.3.    Claims Bar Date ........................................................................................12

  V.  SUMMARY OF THE PLAN...........................................................................12

    5.1.    Classification and Treatment of Claims Classified Under the Plan..........................12

    5.2.    Treatment of Unclassified Claims ...........................................................14

    5.3.    Treatment of Executory Contracts and Unexpired Leases. .......................................15

  VI. IMPLEMENTATION OF THE PLAN ................................................................17

  VII. ACCEPTANCE AND CONFIRMATION ...........................................................18

  VIII. EFFECT OF CONFIRMATION ......................................................................21

    8.1.    Discharge ..............................................................................................21

    8.2.    Releases ...............................................................................................22

  XI. ALTERNATIVES TO THE PLAN....................................................................23

  X.  CERTAIN FEDERAL TAX CONSEQUENCES.................................................23

  XI. ADDITIONAL INFORMATION .......................................................................24

  XII. CONCLUSION

Exhibit 2.2(b) – 124 NY Dispute Summary Chart

Exhibit 5.1 – Claim Treatment Summary Chart

Exhibit 6.1(a) – New Tender Term Sheet and Description of New Lender

Exhibit 6.1(b) – NEB Letter of Intent

Exhibit 6.1(d) – Sources and Uses

Exhibit 6.4 – Rights of Action

Exhibit 7.1 – Liquidation Analysis

# I.

## <u>INTRODUCTION</u>

Voras Enterprise Inc., debtor and the debtor and debtor-in-possession, a New York non-for-profit corporation, commenced this chapter 11 Case on October 26, 2017 by filing a voluntary chapter 11 petition under the Bankruptcy Code in the Bankruptcy Court. Chapter 11 of the Bankruptcy Code allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. The plan provides for the Debtor to reorganize by continuing to operate. The Debtor is the party proposing the Plan. In addition, the Plan is attached hereto.

The document you are reading is the Disclosure Statement in Support of Plan of Reorganization (the "Disclosure Statement"). Unless otherwise defined in this Disclosure Statement, capitalized terms used herein will have the meanings ascribed to them in the Plan.

The Plan is a reorganizing plan. In other words, the Plan proposed by the Debtor provides for the restructuring of the Debtor through the adjustment of certain debtor-creditor relationships. The financial restructuring contemplated under the Plan will restructure the Debtor's outstanding debt obligations such that repayment is possible without forcing a fire sale liquidation of the Debtor's Building to the detriment of the Debtor's creditors and other stakeholders.

In the Debtor's view, the treatment of Claims under the Plan provides a greater and more certain recovery for Creditors than that which is likely to be achieved under other reorganization or liquidation alternatives.

1.1     **Purpose of this Document.**  This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY
IF YOU WANT TO KNOW ABOUT:

(1)   WHO CAN VOTE OR OBJECT;

(2)   THE PROPOSED TREATMENT OF YOUR CLAIM OR INTEREST (i.e., what you will receive on account of your Claim if the Plan is confirmed);

(3)   THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;

(4)   WHAT THE BANKRUPTCY COURT WILL CONSIDER WHEN DECIDING WHETHER TO

CONFIRM THE PLAN;

(5)   THE EFFECT OF CONFIRMATION; and

(6)   THE FEASIBILITY OF THE PLAN.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan may affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Section 1125 of the Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

This Disclosure Statement is provided to each Creditor whose Claim has been scheduled by the Debtor as holding an undisputed, non-contingent or liquidated Claim, or who has filed a proof of claim against the Debtor.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

1.2     **Confirmation Procedures.**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS IN THIS CASE, REGARDLESS OF WHETHER ANY INDIVIDUAL CREDITOR VOTES TO ACCEPT THE PLAN.

(a)     Persons Potentially Eligible to Vote on the Plan.

In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is duly scheduled by the Debtor as undisputed, non-contingent and liquidated, or who, prior to the Confirmation Hearing, has filed with the Bankruptcy Court a timely proof of claim which has not been objected to (and not otherwise allowed by the Bankruptcy Court for voting purposes), disallowed or suspended prior to computation of the votes on the Plan, unless this Court orders otherwise.  The Ballot that you received does not constitute a proof of claim.  If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' Schedules, as well as any amendments thereto, which are on file at the office of the Clerk of the Bankruptcy Court located at the Conrad B. Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Suite 1595, Brooklyn, NY 11201-1800 or may be accessed for a fee via the CM/ECF online docket system at https://ecf.nyeb.uscourts.gov.

       (b)       Who May Vote to Accept/Reject the Plan.

A Creditor has a right to vote for or against the Plan if that Creditor has a Claim that is both (1) Allowed or Allowed for voting purposes and (2) classified in an Impaired Class.

       (c)       What is an Allowed Claim.

As noted above, a Creditor must first have an Allowed Claim to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim. When an objection to a claim is filed, the Creditor holding the claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes

A Creditor may have an allowed claim even if a proof of Claim is not timely filed. A Claim is deemed Allowed if (1) it is scheduled on the Debtors' schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.

THE GENERAL BAR DATE (THE COURT ORDERED DEADLINE) FOR FILING A PROOF OF CLAIM IN THIS CASE IS MARCH 9, 2018.

       (d)       What is an Impaired Claim.

As noted above, an Allowed Claim only has the right to vote if it is in a Class that is Impaired under the Plan (unless otherwise provided). A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class is Impaired if the Plan fails to pay the members of that Class 100% of its Claim plus interest.

In this case, the Debtor believes that Classes 4, 5 and 6 are Impaired. Parties who dispute the Debtor's characterization of their Claim as being Impaired or Unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

       (e)       Who is Not Eligible to Vote.

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed or have been objected to prior to voting on the Plan (unless otherwise allowed by the Bankruptcy Court for voting purposes); (2) Claims in an Unimpared Class; (3) Claims entitled to priority pursuant to sections 507(a)(1), (a)(2), and (a)(8)) of the Bankruptcy Code; and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to sections 507(a)(1), (a)(2), and (a)(8) of the Bankruptcy Code are not entitled to vote because such Claims are not placed in Classes and are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU

MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

(f)     Time and Place of the Confirmation Hearing.

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place before the Honorable Nancy H. Lord, United States Bankruptcy Judge, on __ day, _____, 2018 at __:__ _.m., in Courtroom 3577, at the Conrad B. Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800.

(g)     Deadline for Voting For or Against the Plan.

If you are entitled to vote, it is in your best interest to timely vote on the enclosed Ballot and return the Ballot in the enclosed envelope to:

DICONZA TRAURIG KADISH LLP
Attn: Voras Plan Voting
630 Third Avenue
New York, New York 10017

Your Ballot must be received by _____ __, 2018 at 5:00 p.m. or it will not be counted.

(h)     Who May Object to Confirmation of the Plan.

Any party in interest may object to the confirmation of the Plan, but, as explained herein, not everyone is entitled to vote to accept or reject the Plan.

(i)     Deadline for Objecting to the Confirmation of the Plan.

Objections to the confirmation of the Plan must be filed on or before 5:00 p.m. on __ day, _____, 2018 at     __:__ _.m., with the Bankruptcy Court and served upon Debtor's counsel at the following address:

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Attn:  Allen G. Kadish
       Harrison H.D. Breakstone

Any interested party desiring further information about the Plan should contact Debtor's counsel.

1.3     **Disclaimer.**  The financial data relied upon in formulating the Plan is based on the Debtor's books and records and certain evaluations and projections prepared therefrom.  The Debtor's managers provided the information contained in this Disclosure Statement. The Debtor represents that everything stated in the Disclosure Statement is true to the Debtor's best

information, knowledge and belief.  While every effort has been made to ensure the accuracy of all information, the information presented herein is unaudited and has not been examined, reviewed or compiled by independent public accountants.  Neither the Debtor, nor the Debtor's Professionals, make any representation or warranty regarding the financial or historical information contained herein.

PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.

## II.

## <u>BACKGROUND</u>

2.1    **Description and History of the Debtor's Business.**

The Debtor is a not-for-profit corporation organized under the laws of New York on or about July 31, 2012. The Debtor owns and operates a commercial Building located at 619 Throop Avenue, Brooklyn, New York 11216. The Debtor's stated purpose upon its organization was, and remains, (i) owning, developing, rehabilitating, mortgaging, leasing, maintaining and/or disposing of real property for the purpose of accommodating and promoting commercial and charitable activities intended to promote neighborhood revitalization and combat community deterioration; and (ii) conducting any and all lawful activities which may be useful in accomplishing the foregoing purposes.

The Debtor is a corporation as defined in subparagraph (a)(5) of section 102 and is a Type C corporation under section 201 of the New York Not-for-Profit Corporate Law . The Debtor is organized and operated exclusively for charitable purposes described in section 501(c)(4) of Title 26 of the United States Code that qualify for exemption from federal income taxation under section 501(a) of Title 26 of the United States Code.

The public or quasi-public objective to be achieved by formation of the Debtor was, and remains, to provide assistance in the improvement of the environment and quality of life of citizens and deteriorated urban areas. The Debtor was not organized for pecuniary profit or financial gain. All income and earnings of the Debtor were, and remain, to be used exclusively for corporate purposes. No part of the net income or net earnings of the Debtor have inured to the benefit or profit of any member, trustee, director or officer of the Debtor or any private individual, firm, corporation or association, except reasonable compensation, payments, and distributions made in furtherance of their corporate purpose.

NEB is the sole member of the Debtor. NEB was incorporated in January 1985 as a 501(c)(3) not-for-profit organization with a mission to provide affordable rental housing to low-income residents of Central Brooklyn, with an initial focus on advocacy through block associations and merchant and tenant organizing.

Given that NEB is the sole member of the Debtor and the corporate purpose of the

Debtor and its corporate structure, the operations of the Debtor are executed principally by NEB, the Debtor's sole member. On behalf of the Debtor, NEB executes the administrative, financial and operational support for the Debtor.

The Building is a five-story commercial office building in the Bedford-Stuyvesant neighborhood of Brooklyn. It is partially leased as follows:

| | | |
|---|---|---|
| 1st Floor: | Unit A – | Bedford Stuyvesant Family Health Center |
| | Unit B – | Metro Urgent Medical Care of Brooklyn PLLC |
| 2nd Floor: | Vacant | |
| 3rd Floor: | Brooklyn Legal Services Corporation A | |
| 4th Floor: | Vacant | |
| 5th Floor: | Vacant[1] | |
| Roof: | New Cingular Wireless PCS, LLC | |

The rehabilitiation and occupancy of the Building is part of the effort to improve central Brooklyn for residents and the business community. The Debtor continues its effort to lease up the building. Fully leased, the Debtor believes that the building will become self-sufficient and support a refinance and a chapter 11 reorganization.

2.2       **The Debtor's Secured Creditors.**

(a)          **MTAG Secured Claim.** MTAG Services LLC is a secured creditor of the Debtor. MTAG purchased tax lien certificates in the aggregate amount of $140,698.56.

(b)          **124 NY Secured Claim.** 124 NY is the Debtor's largest secured creditor. 124 NY holds the Original Mortgage encumbering the Building in the principal amount of $4,460,000.00 with interest thereon from November 1, 2015. The amounts owed are disputed in part by the Debtor due to incorrect calculations of fees and interest, a summary of certain aspects of the dispute are set forth on Exhibit "2.2(b)". The most recent payoff statement from 124 NY (as of the Petition Date) provided that as of the Petition Date, the Debtor owed $7,476,537.50 with interest asserted to be continuing to accrue at $1,808.38 per diem.

2.3       **Events Leading to Chapter 11.**

The Debtor first defaulted in its obligations under the Original Mortgage on the November 15, 2015 payment due under the mortgage note and on each payment due thereafter. On February 15, 2016, 124 NY, as assignee of Woodbridge, commenced a commercial foreclosure action in the Supreme Court of the State of New York, county of Kings, against the Debtor and several other parties titled *124 NY, Inc. v. Voras Enterprise, Inc., Northeast Brooklyn Housing Development Corporation, Criminal Court of the City of New York, New York Design Architects, LLP, the People of the State of New York, the City of New York* (No. 502040/2016). On July 6, 2017, a foreclosure on default was entered. The judgment of foreclosure and sale awarded the sum of $6,429,060.56 with default interest from January 12, 2017 plus fees and

---

[1]  Subject to lease dispute and anticipated agreement therewith; subject to Bankruptcy Court approval.

costs.  A foreclosure auction was scheduled for October 26, 2017.  Prior to the sale, the Debtor filed bankruptcy to restructure the Debtor's outstanding debt obligations such that repayment would be possible to all creditors rather than a foreclosure auction to the benefit of 124 NY and to the detriment of the Debtor's creditors and its not-for-profit mission.

## ARTICLE III

## THE PLAN

The table below provides a summary of the classification and treatment of Claims under the Plan.  The figures set forth in the table below as to Claims are based on the Schedules.  There can be no assurance that any Claims will be allowed by the Bankruptcy Court in the aggregate amount set forth.

| CLASS AND ESTIMATED AMOUNT | TYPE OF CLAIM | SUMMARY OF TREATMENT |
|---|---|---|
| Unclassified (Estimate: Undetermined) | DIP Financing | **Non-voting.**  To the extent of any DIP Financing as may be approved by the Bankruptcy Court, such DIP financing will be paid in full upon the Effective Date in accordance with its terms, unless otherwise agreed among the Debtor and the provider of the DIP Financing. |
| Unclassified (Estimate: $10,000) | Administrative Claims (excluding Claims for Professional Compensation and Reimbursement of Expenses). | **Non-voting.**  Each Allowed Administrative Claim except to the extent any entity entitled to payment has received payment on account of such Claim prior to the Effective Date or agrees to less favorable treatment, each Holder of an Allowed Administrative Claim will receive Cash from the Debtor in an amount equal to such Allowed Claim by the later of either (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) the date that is 14 days after the Administrative Claim is Allowed; or (iii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such Allowed Administrative Claim; provided, however, that any Allowed Administrative Claim incurred by the Debtor in the ordinary course of its business will be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.  Since by law holders of Allowed Administrative Claims must be paid in full, these claims are not classified and holders of Allowed Administrative Claims do not vote. |

| | | |
|---|---|---|
| Unclassified<br><br>(Estimate: $150,000.00) | Administrative Claims for Professional Compensation and Reimbursement of Expenses | **Non-voting.** All Professionals seeking payment of Professional Fees incurred through and including the Effective Date will file their respective final applications on or before the date that is 45 days after the Effective Date. Any such application timely filed will be deemed to be an Allowed Administrative Expense Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application. Since by law, holders of Administrative Claims for<br>Professional Compensation and Reimbursement of Expenses must be paid in full to the extent Allowed, these claims are not classified and holders of Administrative Claims do not vote. |
| Unclassified<br><br>(Estimate: Undetermined) | Administrative Tax Claims | **Non-voting.** All Administrative Tax Claims held by Governmental Units will be paid, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Unit as of the Effective Date. These claims are not classified and holders of Administrative Tax Claims do not vote. |
| Unclassified<br><br>(Estimate: $0) | Priority Tax Claims | **Non-voting.** In full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, each Priority Tax Claim will be paid in full as of the Effective Date. These claims are not classified and holders of Priority Tax Claims do not vote. |
| Class 1<br><br>(Estimate: $0) | Priority Claims (other than Priority Tax Claims and Administrative Claims | **Unimpaired; Non-Voting.** All Priority Claims will be paid in full on the Effective Date, or as soon as practicable after such claims become Allowed Claims. Such claims are unimpaired and do not vote. |
| Class 2<br><br>(Estimate: $170,000) | MTAG Secured Claim | **Unimpaired; Non-Voting.** The MTAG Secured Claim will be either (i) paid in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such MTAG Secured Claim. Such claim is unimpaired and does not vote. |
| Class 3<br><br>(Estimate: $7,800,000.00 subject to dispute) | 124 NY Secured Claim | **Unimpaired; Non-Voting**. The 124 NY Secured Claim will be an Allowed Claim to the extent it is not disputed and will be treated under one of the following options:<br>(a) Payment will be made in full on the Effective |

| | | |
|---|---|---|
| | | Date, but to the extent the 124 NY Secured Claim is disputed, the Debtor may elect the Litigation Option pursuant to section 6.3 of the Plan under which the Debtor will pay the disputed amount into the 124 NY Litigation Escrow and make monthly interest payments thereon at the non-default interest rate until resolution, at which time any remaining amount will be paid in Cash or released to the Reorganized Debtor, as appropriate; or<br><br>(b)   Under the Cramdown Option as set forth in section 6.4 of the Plan the 124 NY Secured Claim will be quantified in the amount of the value of the collateral securing such claim, with the deficiency treated as the 124 Deficiency Claim as set forth below. |
| Class 4<br><br>(Estimate: Undetermined, subject to dispute) | 124 NY Deficiency Claim | **Impaired; Voting.**  To the extent of the option set forth in section 4.3 (b) of the Plan, the 124 NY Deficiency Claim will be an Allowed Claim in the amount of the deficiency between the Allowed Amount of the 124 Secured Claim and the value of the collateral of 124 NY.   The 124 Deficiency Claim will be quantified and 50% thereof will be paid (i) over ten years in equal quarterly payments, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such 124 NY Deficiency Claim. |
| Class 5<br><br>(Estimate from Schedules: $208,552.03) | General   Unsecured Claims | **Impaired; Voting.**  The General Unsecured Claims will be quantified and 50% thereof will be paid (i) over five years in equal quarterly payments, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such General Unsecured Claim. |
| Class 6<br><br>(Estimate from Schedules: $922,280.48) | NEB      Unsecured Claim | **Impaired; Non-Voting.**  The amount of the NEB Unsecured Claim outstanding on the Effective Date, will be quantified and 50% thereof will be paid (i) over ten years, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of the NEB Unsecured Claim.  Provided however that payment of the NEB Unsecured Claim will not be accelerated to the extent Class 5 Claims have not been paid in full.  Statutory insider's votes are not counted for purposes of cramdown. |

3.1      **Confirmation of the Plan.**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court will schedule a Confirmation Hearing Date, and the Confirmation Hearing will occur in the Bankruptcy Court as set forth above.  The Bankruptcy Court will set deadlines for objections, if any, to Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, and, if it the Bankruptcy Court determines that they have been, the Bankruptcy Court will enter an order confirming the Plan. The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing.  In the event that any impaired Class of Claims does not accept the Plan, the Debtor may seek a "cramdown" Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. The Debtor believes that the Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code.  See "ACCEPTANCE AND CONFIRMATION -- Requirements for Confirmation" for a description of such requirements. The Confirmation Order would make the Plan binding upon the Debtor, all Creditors and other parties regardless of whether they have accepted the Plan.

## ARTICLE IV

## SIGNIFICANT EVENTS IN THE CASE

4.1      **Professional Retentions.**

On December 7, 2017, the Court entered an order approving the retention of DiConza Traurig Kadish LLP as counsel to represent the Debtor in this Case pursuant to section 327(a) of the Bankruptcy Code [Docket No. 39].

On January 16, 2018, the Court entered an order approving the retention of Mortgage EquiCap LLC as mortgage broker for the Debtor pursuant to sections 327 and 328(a) of the Bankruptcy Code [Docket No. 55].

On January 19, 2018, the Debtor filed an application for an order authorizing the retention of TerraCRG LLC as lease broker for the Debtor pursuant to sections 327 and 328(a) of the Bankruptcy Code [Docket No. 58].

4.2      **Motions and Actions.**

On November 15, 2017, the Debtor filed a motion for an order to authorize the use of cash collateral. [Docket No. 21].

On November 15, 2017, the Debtor filed a motion for an order granting authority to continue utility services and to provide an adequate assurance payment to the Debtor's utility providers. [Docket No. 22].  On January 14, 2018, the Court entered an order granting authority to continue utility services and to provide an adequate assurance payment to the Debtor's utility

providers [Docket No. 54].

On December 6, 2017, 124 NY filed a motion to dismiss the case or convert the case to one under Chapter 7 of the Bankruptcy Code under section 1112(b), or for relief from the automatic stay under sections 326(d)(1) and 362(d)(3). [Docket No. 34]. The Debtor opposed [Docket No. 51]. The hearing is pending.

On December 14, 2017, the Debtor filed a motion for an order authorizing the Debtor to enter into insurance premium financing agreement [Docket No. 41], which was later amended on January 19, 2018 [Docket No. 59].

4.3        **Claims Bar Date.**

On January 7, 2018 the Bankruptcy Court entered an order setting a General Bar Date of March 9, 2018 at 5:00 p.m., for persons and entities, and April 24, 2018 at 5:00 p.m., for government units, thereby setting the deadlines by which the Debtors' Creditors must submit proofs of claim for alleged liabilities not paid and/or damages incurred arising from or related to periods prior to the Petition Date [Docket No. 49].

## ARTICLE V

## SUMMARY OF THE PLAN

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, which is incorporated herein by reference.

5.1        **Classification and Treatment of Claims Classified Under the Plan.**

Classification:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Claims (other than Priority Tax Claims and Administrative Claims) | Unimpaired | No |
| Class 2 | MTAG Secured Claim | Unimpaired | No |
| Class 3 | 124 NY Secured Claim | Unimpaired | No |
| Class 4 | 124 NY Deficiency Claim | Impaired | Yes |

| Class 5 | General Unsecured Claims (other than NEB Unsecured Claim) | Impaired | Yes |
|---------|-----------------------------------------------------------|----------|-----|
| Class 6 | NEB Unsecured Claim | Impaired | No |

As set forth in Article III of the Plan, pursuant to section 1123(a)(l) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debtor have not been classified.

Treatment:[2]

**Class 1 – Priority Claims** (other than Priority Tax Claims and Administrative Claims). Class 1 consists of all Claims, other than Administrative Claims and Priority Tax Claims entitled to priority under section 507 of the Bankruptcy Code. Claims classified in Class 1 are undetermined, and to the extent any exist they will be paid in full on the Effective Date, or as soon as practicable after such Claims become Allowed Claims. Such claims are unimpaired and do not vote.

**Class 2 – MTAG Secured Claim**. Class 2 consists of the Secured Claim held by MTAG in the principal amount of $140,698.56, and will be either (i) paid in full on the Effective Date with appropriate interest, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such MTAG Secured Claim. Such Claim is unimpaired and does not vote.

**Class 3 – 124 NY Secured Claim.** Class 3 consists of the 124 NY Secured Claim held by 124 NY in the alleged amount of $7,476,537.50 and will be an Allowed Claim to the extent it is not disputed and will be treated under one of the following options:

(a)  Payment will be made in full on the Effective Date, but to the extent the 124 NY Secured Claim is disputed, the Debtor may elect the Litigation Option pursuant to section 6.3 of the Plan under which the Debtor will pay the disputed amount into the 124 NY Litigation Escrow and make monthly interest payments thereon at the non-default interest rate until resolution, at which time any remaining amount will be paid in Cash; or

(b)  The 124 NY Secured Claim is quantified in the amount of the value of the collateral securing such Claim, with the deficiency treated as the 124 Deficiency Claim as set forth below.

**Class 4 – 124 NY Deficiency Claim**. Class 4 exists only to the extent of the option set forth in section 4.2 (b) of the Plan. The 124 NY Deficiency Claim will be an Allowed Claim in the amount of the deficiency between the Allowed Amount of the 124 Secured Claim and the value of the collateral of 124 NY. The 124 Deficiency Claim will be quantified and 50% thereof will be paid (i) over ten years in equal quarterly payments, or (ii) be treated as may be otherwise mutually agreed in writing between the Debtor and the holder of 124 NY Deficiency Claim.

**Class 5 – General Unsecured Claims**. Class 5 consists of unsecured Claims against the Debtor

---

[2]  A summary chart of proposed Class identification and treatment is attached hereto as Exhibit "5.1".

not treated elsewhere in the Plan.  The aggregate of Claims that fall in this Class as of the Petition Date not including interest is $208,552.03.  Subject to the provisions of Article VII of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Unsecured Claims, each such holder of an Unsecured Claim, will be treated in the manner set forth in the Plan and the Debtor will pay and perform each and every obligation under the Plan in accordance with the terms thereof.  The General Unsecured Claims will be quantified and 50% thereof will be paid (i) over five years in equal quarterly payments, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such General Unsecured Claim.

**Class 6 – NEB Unsecured Claim.**  Class 6 consists of the NEB Unsecured Claim in the amount of $922,280.48.  The NEB Unsecured Claim will be an Allowed Claim and will be treated as follows in full satisfaction, release and discharge of such Claim:  The amount of the NEB Unsecured Claim outstanding on the Effective Date, will be quantified and 50% thereof will be paid (i) over ten years, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of the NEB Unsecured Claim.  Provided however that payment of the NEB Unsecured Claim will not be accelerated to the extent Class 5 Claims have not been paid in full.

5.2      **Treatment of Unclassified Claims.**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Allowed Priority Tax Claims. Such Claims, to the extent Allowed, will receive the treatment provided in this Article III in full satisfaction, release and discharge thereof.

**DIP Financing Claim.**  To the extent of any DIP Financing as may be approved by the Bankruptcy Court, such DIP Financing will be paid in full upon the Effective Date in accordance with its terms, unless otherwise agreed among the Debtor and the provider of the DIP Financing.

**Administrative Claims.**  Each Allowed Administrative Claim except to the extent any entity entitled to payment has received payment on account of such Claim prior to the Effective Date or agrees to less favorable treatment, each Holder of an Allowed Administrative Claim will receive Cash from the Debtor in an amount equal to such Allowed Claim by the later of either (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) the date that is 14 days after the Administrative Claim is Allowed; or (iii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such Allowed Administrative Claim; provided, however, that any Allowed Administrative Claim incurred by the Debtor in the ordinary course of its business will be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

**Administrative Bar Date.**  Except as otherwise provided in Sections 3.1, 3.3 and 3.4 of the Plan, requests for payment of Allowed Administrative Claims must be filed no later than the Administrative Claim Bar Date as set forth in the Confirmation Order.  Holders of Allowed Administrative Claims that do not file requests for the payment on or before the Administrative Claim Bar Date, will be forever barred from asserting such Allowed Administrative Expense Claims against the Debtor or its property.

**Claims for Professional Fees and Reimbursement.**  All Professionals seeking payment of

Professional Fees incurred through and including the Effective Date will file their respective final applications on or before the date that is 45 days after the Effective Date. Any such application timely filed will be deemed to be an Allowed Administrative Expense Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application.

Objections to any Professional's application for compensation or reimbursement must be timely filed and served upon such Professional, and upon the Debtor, in accordance with the Bankruptcy Rules or any order entered by the Bankruptcy Court. Upon entry of a Final Order approving an application, the fees will be paid within seven days thereafter or otherwise in accordance with the Plan or as agreed to by the Professional and the Debtor.

Funds will be reserved on the Effective Date for anticipated Professional Fees that may be due and payable pursuant to orders entered after the Confirmation Date.

As of the date of this Disclosure Statement, the estimated amounts of Administrative Claims held by Professionals are as follows:

DiConza Traurig Kadish LLP - Counsel for the Debtor
$88,733.36 (as of December 31, 2017)

The funds to pay the approved amounts of such fees will be provided from the Implementation Funds.

**DIP Financing.** To the extent of any DIP Financing as may be approved by the Bankruptcy Court, such DIP financing will be paid in full upon the Effective Date in accordance with its terms, unless otherwise agreed among the Debtor and the provider of the DIP Financing.

**Administrative Tax Claims.** All Administrative Tax Claims held by Governmental Units will be paid, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Unit as of the Effective Date. These claims are not classified and do not vote.

**Priority Tax Claims.** In full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, each Priority Tax Claim will be paid in full as of the Effective Date. These claims are not classified and do not vote.

**Statutory Fees.** On the Effective Date, the Debtors will make all payments required to be paid to the U.S. Trustee pursuant to § 1930 of Title 28 of the United States Code. These fees are estimated at $1,000.00. All fees payable pursuant to § 1930 of Title 28 of the United States Code after the Effective Date will be paid by the Reorganized Debtors on a quarterly basis until the Chapter 11 Case is closed, converted, or dismissed.

5.3      **Treatment of Executory Contracts and Unexpired Leases.**

To the extent not (i) assumed in the Case prior to the Confirmation Date, (ii) rejected

in the Case prior to the Confirmation Date, or (iii) specifically rejected pursuant to the Plan, the Confirmation Order will constitute an Order authorizing the assumption of all Executory Contracts and Unexpired Leases not previously assumed or rejected.

       (a)      The provisions (if any) of each Executory Contract or Unexpired Lease to be assumed under the Plan which is or may be in default will be satisfied solely by such cure amounts as may be found by the Bankruptcy Court.  In the event of a dispute regarding (i) the nature or the amount of any cure, (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure will occur as soon as practicable following agreement of the parties or the entry of a Final Order resolving the dispute and approving the assumption of the Executory Contract or Unexpired Lease.

       (b)      Notwithstanding anything otherwise to the contrary, (i) nothing contained herein will constitute or be deemed to constitute a waiver or relinquishment of any right of the Debtor to object to any cure and it will retain, reserve and be entitled to assert any objection or legal or equitable defense to any cure, and (ii) if a dispute relating to a cure remains unresolved or is resolved in a manner that the Debtor determines, in its sole discretion, does not protect its interests, the Debtor will be entitled to reject the Executory Contract or Unexpired Lease to which such cure dispute relates.

       (c)      Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan, the Debtor will, consistent with the requirements of section 365 of the Bankruptcy Code, following the Effective Date, file and serve on parties to executory contracts or unexpired leases to be assumed and other parties in interest (the "Cure Notice") listing the proposed cure (including amounts of compensation for actual pecuniary loss) to be paid in connection with the assumption of all Executory Contracts or Unexpired Leases to be assumed. The parties to such Executory Contracts or Unexpired Leases to be assumed will have until 30 days following service of the Cure Notice to object in writing to the cure proposed by the Debtor, and to propose an alternative cure.  In the event that no objection is timely filed, the applicable party will be deemed to have consented to the cure proposed (including amounts of compensation for actual pecuniary loss) by the Debtor and will be forever enjoined and barred from seeking any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code from the Debtor, its Estate, the Debtor or any assignee of the contract or lease.  If an objection is timely filed with respect to an Executory Contract or Unexpired Lease, the Bankruptcy Court will hold a hearing to determine the amount of any disputed cure amount not settled by the parties.  Notwithstanding anything otherwise to the contrary, at all times through the date that is five Business Days after the Bankruptcy Court enters an order resolving and fixing the amount of a dispute cure amount, the Debtor will be authorized to withdraw its motion to assume and reject such Executory Contract or Unexpired Lease by notice to the non-Debtor party to such Executory Contract or Unexpired Lease.

**Rejection Claims.**  Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor pursuant to Sections 5.1 of the Plan will be treated as General

Unsecured Claims.

**Bar to Rejection Claims.**  A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Sections 5.1 of the Plan will not be timely unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor within 30 days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim will be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Effective Date.  Any such Claim not timely filed and served will be forever barred from assertion and may not be enforced against the Debtor, its successors or properties.

## ARTICLE VI

## IMPLEMENTATION OF THE PLAN

6.1      **Means of Implementation**.  The Debtor will undertake the following transactions as of the Effective Date:

(a)      **New Mortgage.**  The Debtor will enter into a loan with the New Lender on the terms set forth and according to the documents attached as Exhibit "6.1(a)" hereto.  Also attached as Exhibit "6.1(a)" is a description of the New Lender substantially in its ability to provide the New Mortgage.

(b)      **Investment or Subordinate Financing.**  To the extent Gap Funding is necessary to satisfy in full the Allowed Claims plus all other Effective Date obligations, the Debtor will obtain Gap Funding in the form of (i) new investment in the Reorganized Debtor to achieve Gap Funding, or (ii) NEB will provide financing subordinate to the New Lender in an amount equal to the differential amount between the sum of the proceeds of the New Mortgage along with any new investment funds from any Investor minus the amount needed to fully implement the Plan.  A letter of intent from NEB is attached hereto as Exhibit "6.1(b)."

(c)      **Rent Proceeds and Cash on Hand.**  Rent proceeds and cash on hand will also be used to fund and implement the Plan as available.

(d)      **Sources and Uses.**  An estimate of the sources and uses of the Implementation Funds is attached as Exhibit "6.1(d)."

6.2      **124 Litigation Escrow.**  The Debtor reserves its right to challenge the 124 NY Secured Claim.  If the Debtor elects to challenge the 124 NY Secured Claim, the Debtor will make payment to 124 NY to the extent of the undisputed amount of the 124 NY Secured Claim and to the extent the 124 NY Secured claim is disputed, the Debtor may elect to pay the difference into the 124 NY Litigation Escrow and make monthly interest payments to 124 NY on the principal amount of the 124 NY Litigation Escrow at the non-default interest rate under the Original Mortgage.

6.3 **Cramdown Option.** The Debtor reserves its right to exercise a cram down of the 124 Secured Claim. To the extent the value of the collateral of 124 NY is determined to be less than the value of its alleged allowed claim, as set forth in section 4.3(b) of the Plan, the 124 NY Deficiency Claim will be an Allowed Claim in such amount. The 124 Deficiency Claim will be quantified and paid (i) over ten years at the annual rate of five (5%) simple interest per annum from the Petition Date, prorated over the term of the payout, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such 124 Deficiency Claim.

6.4 **Preservation of Rights of Action**. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Debtor will retain, and in accordance with its determination of the best interest of the Estate, may enforce any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor or the Estate as of the Petition Date, and arising under any provision of state or federal law, or any theory of statutory or common law or equity, including, but not limited to, any cause of action asserted, or which may hereafter be asserted. Any recovery received by the Debtor through the prosecution, settlement or collection of any such claim, right or cause of action, will be retained by the Debtor following the satisfaction of all other Allowed Claims under the terms of the Plan. A *non-exclusive* schedule of specific rights of action preserved is attached hereto as Exhibit "6.4".

6.5 **Modification and Revocation of the Plan.**

The Plan may be altered, amended or modified by the Debtor at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Section 1127 of the Bankruptcy Code authorizes the proponent of a plan of reorganization to modify such plan at any time prior to confirmation of the plan so long as the plan, as modified, continues to meet certain technical requirements of sections 1122 and 1123 of the Bankruptcy Code with respect to the classification of Claims and the contents of a plan. Prior to Confirmation, if the Debtor files modifications to a plan, pursuant to section 1127(a) of the Bankruptcy Code "the plan as modified becomes the plan." No order of the Court is required to modify the Plan under the terms of section 1127(a) of the Bankruptcy Code; however, the proponent of a modification to a plan must comply with section 1125 of the Bankruptcy Code with respect to the plan as modified. In other words, if a modification materially alters the treatment of any Creditor who has accepted the Plan, the Debtor will be required to make additional disclosures to those Creditors whose treatment has been materially and adversely altered and give such Creditors an opportunity to change their votes.

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan will be null and void, and nothing contained in the Plan will constitute a waiver or release of any Claims by or against, or any interest in, the Debtor; or prejudice in any manner the rights of the Debtor.

6.6 **Retention of Jurisdiction.**

The Plan contains detailed provisions providing for the retention of broad jurisdiction by the Bankruptcy Court over this Case for the purposes of, *inter alia*, determining all disputes

relating to Claims, resolving all matters presented by or arising under the interpretation, implementation or enforcement of the Plan and to determine all other matters pending on the Confirmation Date.

## ARTICLE VII

## ACCEPTANCE AND CONFIRMATION

7.1      **Requirements for Confirmation.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.   These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interest" of all Creditors, (vi) the Plan is feasible and (vii) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The Debtor believe that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.**  The so-called "best interest" test requires that each impaired Creditor either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such Entity would receive or if the Debtor's property were to be liquidated under Chapter 7 of the Bankruptcy Code.

Under the Plan, all Allowed Unsecured Creditors will receive Cash equal to at least 50% of their Allowed Claims over time. A 50% payout to Creditors on account of their Allowed Claims would not be assured in a liquidation.

To determine what the holders in each Impaired Class of Claims would receive if the Debtor were liquidated (under chapter 7 or otherwise), the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in a chapter 7 liquidation case.   The amount that would be available for satisfaction of Allowed Claims against the Debtor would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the Cash held by the Debtor at the commencement of the chapter 7 case.   Such amount would be reduced by the amount of any Claim or Claims secured by the Debtor's assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the termination of the Debtor's business.

The costs of liquidation under chapter 7 or otherwise would become Administrative Claims with the highest priority against the proceeds of liquidation.   Such costs would include the fees payable to a chapter 7 trustee or other liquidation agent, as well as those which might

be payable to attorneys, financial advisors, appraisers, accountants and other Professionals that such trustee may engage to assist in the liquidation.  In addition, liquidation costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtor during the pendency of the Case in Chapter 11.

After satisfying Administrative Claims arising in the course of the liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time this Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor.

After consideration of the effects that a liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a liquidation arising from fees payable to the trustee (or liquidating agent), (ii) the erosion in value of the Debtor's assets in the context of the expeditious liquidation and the "forced sale" atmosphere that would prevail, and (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of general Unsecured Creditors, the Debtor firmly believe that if its property were to be liquidated there would be no assurance of recovery or the timing thereof to holders of Unsecured Claims because any recovery would be dependent upon the uncertain outcome of a forced sale of the Building under depressed real estate market conditions.  Any such sale would likely only return value to the MTAG Secured Claim and the 124 NY Secured Claim while prejudicing all other secured and unsecured Creditors.

**Liquidation Analysis.**  As discussed in the foregoing Section under the "Best Interest Test," the Plan provides for the payment in full of all undisputed Allowed Secured Claims, and payment of at least 50% of all Unsecured Claims but there can be no such assurance if the Building were to be liquidated.[3]

**Feasibility.**  For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  The Debtor believes that the Plan is feasible and not reasonably likely to be followed by resort to reorganization or liquidation under the supervision of the Bankruptcy Court. The Debtor has means available to fund the Plan.  First, as discussed above, the Debtor has located a New Lender. In addition, Gap Funding, in the form of Capital Investment and/or the NEB Loan, will, together, fund required Plan payments.

**Confirmation with the Acceptance of Each Impaired Class.**

The Plan may be Confirmed if each impaired Class of Claims accepts the Plan.  Classes of Claims which are not impaired are deemed to have accepted the Plan.  A Class is impaired if the legal, equitable or contractual rights attaching to the Claims of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in Cash.

Holders of Claims impaired by the Plan are entitled to file Ballots accepting or rejecting

---

[3]  A liquidation analysis is attached hereto as Exhibit "7.1."

the Plan. Holders of Claims not impaired by the Plan, are deemed to accept the Plan, and may not vote to accept or reject the Plan. Holders of Claims that will neither receive nor retain any property under the Plan are deemed to reject the Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that Class. Only those Claims, the holders of which actually vote to accept or reject the Plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

With respect to Unsecured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a Class of Unsecured Claims if the holder of any Claim that is junior to the claims of such Class will not receive or retain any distribution under the Plan on account of such junior claim or interest any property.

**Confirmation Without the Acceptance of Each Impaired Class.**  In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class.  The Debtor has requested that the Court confirm the Plan over the rejection of any non-accepting class in the event all other elements of section 1129(a) of the Bankruptcy Code are satisfied.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims.  The Debtor believes that under the Plan all classes of Impaired Claims are treated in a manner that is consistent with the treatment of other classes of Claims with which their legal rights are intertwined, if any, and no class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such class.  Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims.

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule."  Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims that has not accepted the Plan must be paid in full if a more junior class receives any distribution under the Plan.

With respect to Unsecured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Unsecured Claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.

# ARTICLE VIII

# EFFECT OF CONFIRMATION

8.1    **Discharge.**

Except as otherwise provided in the Plan, all parties will be precluded and enjoined from asserting against the Debtor, and its respective successors, assets or properties, or against any property that is distributed, or is to be distributed under the Plan, (including but not limited to the Property) any other or further Claim based upon any acts or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided under the Plan, or a Final Order of the Bankruptcy Court, any judgment at any time obtained, to the extent that such judgment is a determination of the liability of the Debtor with respect to any debt discharged pursuant to the Plan will be null and void and of no force and effect, regardless of whether a Proof of Claim therefor was filed or deemed filed and, except as otherwise provided in the Plan, all Creditors holding Claims against the Debtor, will be precluded from asserting against the Debtor, and any of its assets or the Property, or any property distributed under the Plan, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, and the Confirmation Order will permanently enjoin all Creditors and their successors and assigns, from enforcing or seeking to enforce any such Claims.

8.2    **Releases**

Section 1125(e) of the Bankruptcy Code, protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan. Pursuant to section 1125(e), neither the Debtor, nor any of their respective members, officers, managers, directors, agents or employees (acting in such capacity) nor any attorney or Professionals employed by any of them, will have or incur any liability to any person or entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, prosecution, dissemination, Confirmation, consummation or administration of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or the distribution of property under the Plan, or any other action taken or omitted to be taken in connection with the Case or the Plan, except as may be expressly provided for in such agreements or documents, and except for willful misconduct or gross negligence. From and after the Effective Date, a copy of the Confirmation Order and the Plan will constitute and may be submitted as a complete defense to any claim or liability released pursuant to the Plan.

**NEB Release.** The Plan provides that on the Effective Date, the Debtor, and each Creditor will be deemed to have irrevocably waived and released and discharged NEB and its affiliates or any of its respective officers, managers, directors, employees, members, partners, representatives, attorneys, predecessors, successors and assigns from any and all claims, obligations, rights,

suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, arising in connection with any Claims or obligations on behalf of the Debtor that occurred on or prior to the Effective Date.

**Debtor Release.**  The Plan provides that on the Effective Date, each Creditor will be deemed to have irrevocably waived and released and discharged the Debtor and its affiliates or any of its respective officers, managers, directors, employees, members, partners, representatives, attorneys, Professionals, predecessors, successors and assigns (collectively, the "Debtor Released Parties") from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date; provided, however, that the foregoing release and discharge will not constitute a release or discharge of the Debtor from any of its obligations under the Plan.  In addition, on the Effective Date each Creditor will be deemed to have waived and released and discharged the Debtor and its respective officers, directors, employees, representatives, attorneys and Professionals from all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan.

## ARTICLE IX

## ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code or otherwise, (b) the dismissal of this Case or relief from the stay in favor of 124 NY and the resulting continuation of the Foreclosure Action and sale by 124 NY, or (c) the promulgation and confirmation of an alternative plan of reorganization.

As discussed under the Section entitled "Best Interest Test", under alternatives (a) and (b) above, there would be no assurance of recovery or the timing thereof to Creditors holding Unsecured Claims because any recovery would be dependent upon the uncertain outcome of a forced sale of the Building.  The Debtor believes that the Plan provides the greatest likelihood for a substantial recovery by the Creditors.

## ARTICLE X

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Unsecured Claim. This summary does not cover all potential U.S. federal income tax consequences that could possibly arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Unsecured Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. *Holders of Allowed Unsecured Claims should consult their own tax advisors as to the Plan's specific federal, state, local and foreign income and other tax consequences.*

In accordance with the Plan, each holder of an Allowed Unsecured Claim (a "Holder") will be entitled to his, her or its pro-rata share of the payments made to Holders of Allowed Unsecured Claims. Each such holder will recognize gain or loss upon the receipt of such pro-rata share equal to the difference, if any, between the "amount realized" by such Holder and the holder's adjusted basis in his, her or its Allowed Unsecured Claim. The "amount realized" is equal to the value of such holder's pro-rata share of the payments made to holders of Allowed Unsecured Claims. Any gain or loss realized by such a holder should constitute ordinary income or loss to him, her or it unless the Unsecured Claim is a capital asset. If an Unsecured Claim is a capital asset, and it has been held for more than one year, such Holder will likely realize long term capital gain or loss.

The tax consequences to holders of claims will differ and will depend on factors specific to each Holder, including but not limited to: (i) whether the holder's Unsecured Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Holder's Claim; (iii) the type of consideration received by the holder in exchange for the Unsecured Claim; (iv) whether the Holder is a United States person or foreign person for tax purposes; whether the Holder reports income on the accrual or cash basis method; and (v) whether the Holder has taken a bad debt deduction or otherwise recognized loss with respect to an Unsecured Claim.

THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT EACH HOLDER OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER AS A RESULT OF THE PLAN.

THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON A TAX PAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH HOLDER SHOULD SEEK ADVICE BASED UPON THE HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE XI

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the

Ballots and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to Debtor's counsel:

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Allen G. Kadish, Esq.
Harrison H.D. Breakstone, Esq.

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in this Case are on file in the Office of the Clerk of the United States Bankruptcy Court at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York 11201, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m. Additionally, copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in this case may be viewed and printed over the Internet from the Bankruptcy Court's Electronic Case Filing system at http://www.nyeb.uscourts.gov.

## ARTICLE XII

## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors and strongly encourages all holders of Claims against the Debtor to vote to accept the Plan and to return your Ballot by the date set by the Bankruptcy Court.

Dated:  New York, New York
        January 24, 2018

VORAS ENTERPRISE INC.
Debtor and Debtor-in-Possession


By:  s/ Jeffrey Dunston
                                     
Jeffrey Dunston
President and Chief Executive Officer


DICONZA TRAURIG KADISH LLP


By:  s/ Allen G. Kadish
                                     
Allen G. Kadish
Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017
Tel:  (212) 682-4940
Fax:  (212) 682-4942
Email:    akadish@dtklawgroup.com
                hbreakstone@dtklawgroup.com

*Counsel for Voras Enterprise Inc.,*
*Debtor and Debtor-in-Possession*

**<u>Exhibit 2.2(b)</u>**

**124 NY Dispute Summary Chart**

**Interest Anaylsis (Based on Principal Due minus $1,540,000.00**

Note: This document is subject to amendments and adjustments.

### Interest Payment Anaylsis



**Disputed Amounts Based on 10/26/2017 Payoff Letter from 124 NY**

| | | |
|---|---|---|
| A  Interest Payment Through December 2015 | 11/1/2015 thru 12/31/2015 | |
| PV | $ 4,460,000.00 | |
| Rate | 12% | |
| Int. Period | 1 months | |
| Loan Term | 1 year | |
| Mnthly Int. | ($44,600.00) | |
| Int. Period  x | 2 months | |
| Tot. Int. | ($89,200.00) | |
| Take Out Amt. | $ (4,549,200.00) | |

Voras firmly asserts and disputes the interest calculation on the $1,540,000.00.  These funds were never confirmed or released by 124 NY.  This should have caused a reduction in the mortgage principal to $4,460,000.00.   $ 1,540,000.00

Regular Interest Payment is overstated by according to when the default period begun and therefore regular interest would no longer be accured.  In essence, 124 NY is charging 36% interest which is not consistent with the mortgage note.   $ 1,180,000.00

Real Estate Taxes and Fees - 124 NY has not proved proof of payment of the RE Taxes and Fee. Based on city records and payment made the last payment of RE taxes occurred in 2015. I was not until 7/01/2017 the Voras was billed for RE Taxes and Other Fees.   $ 181,944.85

Interest on Real Estate Taxes is disputed for reasons stated above.   $ 23,342.08

Voras believes that 124 NY Pay off total is overstated and not in line with the mortgage note provisions.  $ 2,925,286.93

**Default Interest Period**

| B  Default Interest Payment Through December 2016 | 12/31/2016 | B  Default Interest Payment Through December 2017 | 1/12/2017 | B  Interest Payment 2018 | 1/1/2018 | 4/30/2018 |
|---|---|---|---|---|---|---|
| PV | $ 4,460,000.00 | PV | $ 4,460,000.00 | PV | $ 4,460,000.00 | |
| Rate | 24% | Rate | 24% | Rate | 12% | |
| Int. Period | 1 months | Int. Period | 1 months | Int. Period | 1 months | |
| Loan Term | 1 year | Loan Term | 1 year | Loan Term | 1 year | |
| Mnthly Int. | ($89,200.00) | Mnthly Int. | ($89,200.00) | Mnthly Int. | ($44,600.00) | |
| Int. Period  x | 12 months | Int. Period  x | 12 months | Int. Period  x | 4 months | |
| Tot. Int. | ($1,070,400.00) | Tot. Int. | ($1,070,400.00) | Tot. Int. | ($178,400.00) | |
| Take Out Amt. | $ (5,530,400.00) | Take Out Amt. | $ (5,530,400.00) | Take Out Amt. | $ (4,638,400.00) | |

| Outstanding Balance | $ (4,460,000.00) | Outstanding Balance | $ (4,460,000.00) | Outstanding Balance | $ (4,460,000.00) |
|---|---|---|---|---|---|
| Interest Payment A | ($89,200.00) | Interest Payment A | $0.00 | Interest Payment A | $0.00 |
| Interest Payment B | ($1,070,400.00) | Interest Payment B | ($1,070,400.00) | Interest Payment B | ($178,400.00) |
| **Cumulative Balance Due** | **$ (5,619,600.00)** | Cumulative Balance Due | **$ (6,690,000.00)** | Cumulative Balance Due | **$ (6,868,400.00)** |

**Exhibit 5.1**

**Claim Treatment Summary Chart**

**<u>Exhibit 6.1(a)</u>**

**New Lender Term Sheet**

**and**

**Description of New Lender**



825 Third Avenue, 37th Floor
New York, NY 10022
P (888) 261-6234  F (646) 219-5643
www.madisonrealtycapital.com

## Term Sheet

January 12, 2018

Voras Enterprise Inc.
132 Ralph Avenue
Brooklyn, New York 11233

Gentlemen:

Following are proposed terms pursuant to which MRC RE Holdings II LLC ("Madison" or "Lender") will consider entering into a loan transaction with Borrower (the "Loan"). This term sheet shall expire seven (7) days from the date hereof.

| | |
|---|---|
| **Borrower:** | A single asset bankruptcy remote entity(s) with independent director(s) acceptable to Madison. |
| **Lender:** | MRC RE Holdings II LLC and/or its affiliates. |
| **Property:** | 601-609 Throop Avenue, Brooklyn, New York (the "Property"). |
| **Loan Amount:** | The lesser of (i) Seven Million and 00/100 Dollars ($7,000,000) and (ii) Sixty Percent (60%) of the "As Is" value of the Property. $5,500,000 of the proceeds of the Loan will be advanced upon origination of the Loan and the remaining $1,500,000 will be advanced for tenant improvements and leasing commissions in accordance with the Loan Documents (as defined below). |
| **Security:** | A first mortgage or mortgages and security agreement which shall encumber and be cross collateralized against the Property. In addition, an assignment of, and security interest in, all current and future leases, rents and income for the Property and a UCC-1 fixture filing perfecting the pledge of all furniture, fixtures and equipment and all other personal property of Borrower. The mortgage and security interest shall constitute valid first liens, subject to no other liens or encumbrances. No additional senior or secondary financing shall be permitted during the term of the Loan, either secured or unsecured. Additionally, Borrower, Guarantor and any owner of the equity interest in Borrower shall pledge to Lender a senior security interest in 100% of the ownership of such entity. Lender reserves the right to split the Loan into multiple loans or tranches. |
| **Loan Term:** | Eighteen (18) months. |

{Term Sheet – 601 Throop}

**Option to Extend:**   Provided (i) no event of default exists under the Loan and the Loan Documents (as defined hereunder); (ii) all payments are made on time; (iii) there are no prior defaults under the Loan Documents; and (iv) upon a satisfactory credit check, Borrower may extend the loan for a two (2) separate six (6) month periods (each an "Extension Period"). In consideration for each separate extension of the Loan, (i) Borrower shall pay to Lender a one percent (1.0%) extension fee, on the remaining balance of the principal sum of the Loan, whether advanced or yet to be advance and (ii) Borrower shall fund to Lender an interest reserve equal to all interest due and payable during the respective Extension Period.

**Interest Rate:**   The Loan shall bear interest at an adjustable rate (adjusted as and when the Prime Rate or LIBOR changes) at the greater of (i) WSJ Prime + Five and One Half Percent (5.50%) per annum and (ii) One Month LIBOR + Eight and 50/100 Percent (8.50%), with a floor of Ten and 00/100 Percent (10.00%) per annum.

**Amortization:**   Interest only. Interest for the period from and including the date of Closing through the end of the month shall be paid at Closing.

**Prepayment:**   No prepayment of the Loan shall be permitted without the Lender, or its assigns, having received nine (9) full months of interest on the Loan Amount of $7,000,000 regardless of the amounts advanced under the Loan. During an Extension Period, no prepayment of the Loan shall be permitted without the Lender, or its assigns, having received six (6) full months of interest on the Loan Amount of $7,000,000 regardless of the amounts advanced under the Loan.

**Origination Fee:**   Upon the closing of the Loan, Borrower shall pay to Madison a fee equal to Two Percent (2.0%) of the Loan Amount.

**Broker Fee:**   Borrower shall indemnify, defend and hold Lender harmless for any claims for Broker's commissions in connection with the Loan.

**Expense Deposit:**   Borrower's acceptance of this Term Sheet shall constitute its unconditional agreement to pay all out of pocket fees, costs, charges and expenses with respect to the Loan, including, without limitation, the fees and expenses of Lender's counsel and all recording and filing fees, stamps and taxes. Upon the execution and return of this Term Sheet, the Borrower shall deposit in the form of wire transfer an expense deposit of $25,000 (the "Expense Deposit"). The Expense Deposit shall be paid by Guarantor and shall be is non-refundable and will be applied to closing costs at Closing. NOTE: Prior to Lender engaging legal counsel in connection with the due diligence and documentation of the Loan, the Borrower shall pay an additional deposit of $7,500.00 to Lender's

counsel Kriss & Feuerstein LLP.

**Due Diligence:** Due diligence will commence upon Lender's receipt of the executed Term Sheet and payment of the Expense Deposit. The Lender reserves the right to perform and order all reports deemed necessary in evaluating the Property, the Borrower and the Guarantor (as defined hereunder). These reports shall include a complete review of the financial and credit information of the Borrower and the Guarantor, a complete review of the surrounding market and a complete review of the Property. Borrower shall only be permitted to a receive copy of any such reports if Borrower provides Lender with a general release and Borrower further agrees to indemnity, defend and hold Lender harmless with respect to the reports.

**Interest Reserve:** To be determined upon the origination of the Loan.

**Other Escrows:** To be determined by Lender at closing of the Loan. Any escrows held by Lender shall constitute additional collateral security for the Loan and in the event of a default, Lender shall be permitted to apply same to the Loan in such order as Lender shall determine.

**Insurance:** Borrower shall provide Lender with certificates of insurance evidencing that all insurance required under the Mortgage ("Insurance Policies") is in full force and effect and in form acceptable to Lender in its sole discretion. Borrower shall covenant that the Insurance Policies shall remain in full force and effect throughout the Loan Term. The Borrower shall maintain at all times, at the Borrower's sole cost and expense, policies of liability and property (including business income and terrorism coverage) insurance, builder's risk, law and ordinance insurance and other insurance coverage required by the Lender according to the Loan Documents. The Insurance Policies must be paid for the term of the Loan at closing. Lender, its successors and/or assigns must be listed as mortgagee, loss payee, and additional insured. All Insurance Policies shall be issued by insurance companies satisfactory to Lender having an A.M. Best Key Rating of at least A/IX.

**Title & Searches:** Borrower must provide the Lender with such searches with respect to the title to the Property, the Borrower and its principals and the Guarantor as Lender may require, including a survey thereof certified to Lender and the applicable title company. The Borrower shall purchase an ALTA title insurance policy for Lender in the amount of the Loan, containing such endorsements as Lender may require in its discretion. The title company shall be selected by Lender. Lender shall also require a UCC policy insuring the equity pledge.

**Guaranty:**          Northeast Brooklyn Development Housing Corporation ("Guarantor") shall guaranty all obligations of Borrower in connection with the Loan. Guarantor shall also deliver an environmental indemnity.

**Lease Approval:**    Lender shall have the right to approve new leases and amendments to existing leases.

**Documentation:**     Upon acceptance of the fully executed Term Sheet and receipt of the Expense Deposit, Madison shall begin its due diligence. Documentation of the Loan shall be on Lender's standard loan documentation, subject to the terms hereof. Loan documents will include, in addition to the provisions that are summarized herein, provisions that, in the sole discretion of Lender, are customary, typical or appropriate for the Loan (the "Loan Documents").

**Closing:**           On or about thirty (30) days from the date hereof, at the discretion of Lender.

**Exclusivity:**       Borrower and Guarantor hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of the Loan; (b) in Lender's industry, business opportunities are limited and extremely competitive; (c) compensation to the Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit its resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry in the event the Borrower does not complete this proposed transaction or obtains financing from a competitor of the Lender. Accordingly, Borrower and Guarantor hereby expressly agrees to work solely with Lender to procure the Loan and agrees not to, and will cause their principals and affiliates not to, obtain or attempt to arrange financing in connection with the Property with any party other than Lender. In the event the Borrower, Guarantor or an affiliate or controlled entity of either (a) obtains financing for the Property from a source other than Lender (including joint venture equity), or (b) sells, assigns or otherwise conveys the Property or its contract to acquire the Property, Borrower and Guarantor shall be obligated to pay and Lender shall be deemed to have earned a break-up fee in the amount of $210,000.00, which break-up fee constitutes a reasonable estimate of Lender's damages and which break-up fee shall constitute liquidated damages. Borrower and Guarantor shall be responsible for Lender's legal fees and costs in connection with the recovery of the break-up fee. This foregoing exclusivity provision is in consideration for Lender issuing this Term Sheet and shall be binding upon Borrower and Guarantor regardless of Lender making a loan offer. This exclusivity provision shall expire on May 1, 2017. Notwithstanding the foregoing, this exclusivity provision shall not be binding upon Borrower and Guarantor, if Borrower, or affiliates of Borrower, do not retain ownership of the Property as a result of the pending bankruptcy proceedings.

**No Commitment:**     This Term Sheet and the funding of the Loan is subject to, and conditioned upon, completion of all due diligence and execution of legal documentation to the satisfaction of Lender and its counsel in their sole and absolute discretion, including review and approval of all Property-related documents, including, without limitation, title reports, insurance policies and/or certificates, surveys, engineering and property condition reports, environmental reports, construction budgets, construction plans and specifications, permits, construction contracts, operating statements and tenant and lease information. If, prior to the proposed disbursement of the loan proceeds, any fact or circumstance concerning or affecting the Property, the Borrower or any Guarantor varies in the Lender's sole and absolute discretion from information previously submitted to or received by Lender, or if the representations herein prove to be untrue, then Lender shall have the right to refuse to consummate the Loan. Lender shall have no liability to Borrower, its principal, and/or any Guarantor should the Loan fail to close. Handwritten modifications to this Term Sheet will not be binding upon Lender. Notwithstanding anything to the contrary set forth herein, this Term Sheet is not a commitment by Lender to fund the Loan and Lender shall not be obligated to close the Loan for any reason or no reason in its sole and absolute discretion. This Term Sheet outlines the general terms and conditions under which Lender shall proceed and does not constitute a loan commitment, either express or implied, on behalf of Lender, and does not impose any obligation on Lender to make the Loan.

**THE LOAN AND THE TERMS THEREOF AS SET FORTH IN THIS TERM SHEET ARE SUBJECT TO THE APPROVAL OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK. THE FORM OF ANY COURT ORDERS IN CONNECTION THEREWITH SHALL BE SUBJECT TO THE APPROVAL OF LENDER IN IS SOLE DISCRETION.**

Please acknowledge your acceptance of the terms and conditions described herein by faxing Madison an executed copy of this letter and wiring the Expense Deposit. Once receipt is confirmed, the due diligence process will commence.

[SIGNATURE PAGE FOLLOWS]

{Term Sheet – 601 Throop}

Sincerely,

**MRC RE HOLDINGS II LLC**

By: _____
    Joshua Zegen,
    Authorized Person

**ACCEPTED AND AGREED**:

**BORROWER:**

**VORAS ENTERPRISE INC.**

By: _____
    Name: JEFFREY DUNSTON
    Title: President

**GUARANTOR:**

**NORTHEAST BROOKLYN HOUSING DEVELOPMENT CORPORATION**

By: _____
    Name: JEFFREY DUNSTON
    Title: CEO/ President

{Term Sheet – 601 Throop}



## History

Madison Realty Capital (MRC) is a leading real estate investment management firm based in Manhattan, New York.  Through the firm's vertically integrated structure, MRC has closed in excess of $5.5 billion of real estate debt and equity transactions in the multifamily, retail, office and industrial sectors.  The firm was co-founded by Brian Shatz and Joshua Zegen in 2004 to pursue U.S. commercial real estate investment opportunities. Madison aims to provide institutional investors with superior risk-adjusted returns with downside principal protection.

- Diverse platform focus with both debt and equity capabilities

- Successfully acquires, manages and exits investments across the United States

- Investments are acquired and managed through a series of vehicles, backed by premier institutional investors, as well as on a separate accounts basis

- MRC's platform consists of over 100 investment professionals with debt and equity expertise

- In-house capabilities include originations, acquisitions, underwriting, servicing, legal, asset management, property management, construction management, development, capital markets and syndication

**Exhibit 6.1(b)**

**NEB Letter of Intent**

**Exhibit 6.1(d)**

**Sources and Uses**

**Exhibit 6.4**

**All rights of action are preserved including the following:**

| Counter Party: | Summary Description |
| --- | --- |
| 124 NY Inc. | The Debtor preserves the right to challenge the amount of the 124 NY Secured Claim, including with respect to the failure to reimburse the Debtor for improvements as set forth in the underlying mortgage documents, and with respect to potential mis-calculation of interest or of other amounts due. |
| Donaldson & Chilliest, LLP | The Debtor preserves the right to pursue an action against its former professionals for breach of the duty to provide skillful and competent representation, causation, and resulting financial loss. |
| Tax Certiorari (State of New York) | The Debtor preserves the right to challenge all real property assessments on its Building, located at 601-609 Throop Avenue, Brooklyn, New York 11233. |

**Exhibit 7.1**

**Liquidation Analysis**