UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                          Chapter 11

VORAS ENTERPRISE INC.,                          Case No. 1-17-45570 (NHL)

        Debtor.

------------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT
## IN SUPPORT OF AMENDED CHAPTER 11 PLAN

Dated:  June 19, 2018

ARCHER & GREINER, P.C.
630 Third Avenue
New York, New York 10017
Tel: (212) 682-4940
Fax: (212) 682-4942
Allen G. Kadish
Harrison H.D. Breakstone
Email: akadish@archerlaw.com
hbreakstone@archerlaw.com

*Counsel for Voras Enterprise Inc.,*
*Debtor and Debtor-in-Possession*

## DISCLAIMER PURSUANT TO LBR 3017-1(b)
**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

# I.

# INTRODUCTION

Voras Enterprise Inc., a New York non-for-profit corporation, debtor and debtor-in-possession commenced this chapter 11 Case on October 26, 2017 by filing a voluntary chapter 11 petition under the Bankruptcy Code in the Bankruptcy Court.  Chapter 11 of the Bankruptcy Code allows the debtor, and under some circumstances, creditors and other parties in interest, to propose a chapter 11 plan. The Plan provides for the Debtor to sell its key asset, the Building, and pay creditors, from the proceeds of sale, the "Implementation Funds."   The Sale is contemplated to achieve proceeds sufficient to pay all Allowed Administrative, Priority, Secured and Unsecured Claims in full, subject to certain limitations described herein.   The Debtor is the party proposing the Plan.  The Plan is attached hereto.

In the Debtor's view, the treatment of Claims under the Plan provides a greater and more certain recovery for Creditors than that which is likely to be achieved under other reorganization or liquidation alternatives.

The document you are reading is the *Amended Disclosure Statement in Support of Amended Chapter 11 Plan* (this "Disclosure Statement").   Unless otherwise defined in this Disclosure Statement, capitalized terms used herein will have the meanings ascribed to them in the Plan.

1.1      **Purpose of this Document.**   This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY
IF YOU WANT TO KNOW ABOUT:

    (1)   WHO CAN VOTE OR OBJECT;

    (2)   THE PROPOSED TREATMENT OF YOUR CLAIM
        (i.e., what you will receive on account of your Claim
        if the Plan is confirmed);

    (3)   THE HISTORY OF THE DEBTOR AND
        SIGNIFICANT EVENTS DURING THE
        BANKRUPTCY;

    (4)   WHAT THE BANKRUPTCY COURT WILL
        CONSIDER WHEN DECIDING WHETHER TO
        CONFIRM THE PLAN;

    (5)   THE FEASIBILITY OF THE PLAN; and

(6)    THE EFFECT OF CONFIRMATION.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan may affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Section 1125 of the Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

This Disclosure Statement is provided to each Creditor holding a Claim that has been scheduled by the Debtor as an undisputed, non-contingent or liquidated Claim, or who has filed a proof of claim against the Debtor.

## 1.2    **Confirmation Procedures.**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS IN THIS CASE.

(a)    No Voting.

The Plan provides for payment of all Allowed Administrative, Priority, Secured and Unsecured Claims in full, subject to certain limitations described herein. Therefore, no Creditors are invited to vote on the Plan.

(b)    Who May Vote to Accept/Reject the Plan.

In general, a creditor has a right to vote for or against a plan if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

(c)    What is an Allowed Claim.

As noted above, an impaired creditor must first have an allowed claim to have the right to vote. Generally, any proof of claim or interest is deemed allowed, unless a party in interest files an objection to the claim. When an objection to a claim is filed, the creditor holding the claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes.

A creditor may have an allowed claim even if a proof of claim is not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.

THE GENERAL BAR DATE (THE COURT ORDERED DEADLINE) FOR FILING A PROOF OF CLAIM IN THIS CASE WAS MARCH 9, 2018.

(d)    What is an Impaired Claim.

As noted above, an allowed claim only has the right to vote if it is in a class that is impaired under the plan (unless otherwise provided).  A class is impaired if the plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class is impaired if the plan fails to pay the members of that class 100% of its claim plus interest.

In this case, the Debtor believes that no Class is Impaired.  Parties who dispute the Debtor's characterization of their Claim as being Unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

(e)    Who is Not Eligible to Vote.

The following four types of claims are not entitled to vote: (1) claims that have been disallowed or have been objected to prior to voting on the plan (unless otherwise allowed by the Bankruptcy Court for voting purposes); (2) claims in an unimpaired class; (3) claims entitled to priority pursuant to sections 507(a)(1), (a)(2), and (a)(8)) of the Bankruptcy Code; and (4) claims in classes that do not receive or retain any value under the plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the plan.  Claims entitled to priority pursuant to sections 507(a)(1), (a)(2), and (a)(8) of the Bankruptcy Code are not entitled to vote because such claims are not placed in classes and are required to receive certain treatment specified by the Bankruptcy Code.  Claims in classes that do not receive or retain any value under the plan do not vote because such classes are deemed to have rejected the plan and are entitled to certain consideration by the Bankruptcy Court. *The Plan proposes that all Creditors, with certain limitations described herein, are to be paid in full and therefore hold Unimpaired Claims.*  Therefore, no Creditors are entitled to vote on the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

(f)    Time and Place of the Confirmation Hearing.

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place before the Honorable Nancy H. Lord, United States Bankruptcy Judge, on Thursday, July 26, 2018 at 3:30 p.m., in Courtroom 3577, at the Conrad B.  Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800.

(g)    Who May Object to Confirmation of the Plan.

Any Creditor or other party in interest may object to the Confirmation of the Plan.

(h)    Deadline for Objecting to the Confirmation of the Plan.

Objections to the Confirmation of the Plan must be filed with the Bankruptcy Court on or before Thursday, July 19, 2018, and served upon Debtor's counsel at the following address:

ARCHER & GREINER, P.C.
*Counsel for Voras Enterprise Inc.*
Attn:  Allen G. Kadish
Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017

Any interested party desiring further information about the Plan should contact Debtor's counsel.

1.3    **Disclaimer.**  The financial data relied upon in formulating the Plan is based on the Debtor's books and records and certain evaluations and projections prepared therefrom.  The Debtor's managers provided the information contained in this Disclosure Statement. The Debtor represents that everything stated in the Disclosure Statement is true to the Debtor's best information, knowledge and belief.  While every effort has been made to ensure the accuracy of all information, the information presented herein is unaudited and has not been examined, reviewed or compiled by independent public accountants.  Neither the Debtor, nor the Debtor's Professionals, make any representation or warranty regarding the financial or historical information contained herein.

THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.

**II.**

**<u>BACKGROUND</u>**

2.1    **Description and History of the Debtor's Business.**

The Debtor is a not-for-profit corporation organized under the laws of New York on or about July 31, 2012. The Debtor owns, as its key asset, and operates, a commercial Building located at 601-619 Throop Avenue, Brooklyn, New York 11216. The Debtor's stated purpose upon its organization was, and remains, (i) owning, developing, rehabilitating, mortgaging, leasing, maintaining and/or disposing of real property for the purpose of accommodating and promoting commercial and charitable activities intended to promote neighborhood revitalization

5

and combat community deterioration; and (ii) conducting any and all lawful activities which may be useful in accomplishing the foregoing purposes.

The Debtor is a corporation as defined in subparagraph (a)(5) of section 102 and is a Type C corporation under section 201 of the New York Not-for-Profit Corporate Law. The Debtor is organized and operated exclusively for charitable purposes as described in 28 U.S.C. §501(c)(4) that qualify for exemption from federal income taxation under 28 U.S.C. §501(a).

The public or quasi-public objective to be achieved by formation of the Debtor was, and remains, to provide assistance in the improvement of the environment and quality of life of citizens and deteriorated urban areas. The Debtor was not organized for pecuniary profit or financial gain. All income and earnings of the Debtor were, and remain, to be used exclusively for corporate purposes. No part of the net income or net earnings of the Debtor have inured to the benefit or profit of any member, trustee, director or officer of the Debtor or any private individual, firm, corporation or association, except reasonable compensation, payments, and distributions made in furtherance of their corporate purpose.

NEB is the sole member of the Debtor. NEB was incorporated in January 1985 as a section 501(c)(3) not-for-profit organization with a mission to provide affordable rental housing to low-income residents of Central Brooklyn, with an initial focus on advocacy through block associations and merchant and tenant organizing.

Given that NEB is the sole member of the Debtor, the corporate purpose of the Debtor, and its corporate structure, the operations of the Debtor, are executed principally by NEB.  NEB executes administrative, financial and operational support for the Debtor.

The Building is a five-story commercial office building in the Bedford-Stuyvesant neighborhood of Brooklyn. Currently, it is partially leased as follows:

| 1st Floor: | Unit A – Bedford Stuyvesant Family Health Center |
| | Unit B – Metro Urgent Medical Care of Brooklyn PLLC |
| 2nd Floor: | Vacant |
| 3rd Floor: | Brooklyn Legal Services Corporation A |
| 4th Floor: | Vacant |
| 5th Floor: | Vacant |
| Roof: | New Cingular Wireless PCS, LLC |

## 2.2    The Debtor's Secured Creditors.

(a)    **MTAG Secured Claim.** MTAG Services LLC is a pre-petition secured creditor of the Debtor.  MTAG purchased tax lien certificates in the aggregate amount of $140,698.56. The estimated amount of the MTAG Secured Claim, including accruing interest, as of August 31, 2018, is $177,806.10.

(b)    **124 NY Secured Claim.**  124 NY is the Debtor's largest secured creditor. 124 NY acquired and holds the Original Mortgage encumbering the Building in the principal

amount of $4,460,000.00 with interest thereon from November 1, 2015.  The most recent payoff statement from 124 NY provided that as of the Petition Date, the Debtor owed $7,476,537.50 with interest asserted to be continuing to accrue at $1,808.38 per diem.  The estimated amount of the 124 NY Secured Claim as of August 31, 2018 is $8,125,910.63.

(c)    **Remaining Secured Claims (besides MTAG and 124 NY Secured Claim)**.  The following creditors have secured claims as approximated and set forth below and remain subject to final liquidation:

i.    New York Design Architects, LLP – Holds a pre-petition mechanics lien for services rendered and unpaid in the amount of $48,085.14 (as of August 31, 2018).

ii.    New York City Water Board – Holds a pre-petition and post-petition secured claim for unpaid water charges in the amount of $49,000.00 including interest and other charges (estimated as of August 31, 2018).

iii.    New York City Office of Administrative Trials and Hearings – Holds a pre-petition secured claim for a pre-petition New York City Fire Department violation in the amount of $5,819.75 including interest and other charges (estimated as of August 31, 2018).

iv.    New York City Department of Finance – Holds a secured claim for unpaid post-petition real estate taxes in the amount of $200,767.02 including interest and other charges (estimated as of August 31, 2018).

2.3    **Events Leading to Chapter 11.**

The Debtor first defaulted in its obligations under the Original Mortgage on the November 15, 2015 payment due under the mortgage note and on each payment due thereafter. On February 15, 2016, 124 NY, as assignee of Woodbridge, commenced a commercial foreclosure action in the Supreme Court of the State of New York, county of Kings, against the Debtor and several other parties titled *124 NY, Inc. v. Voras Enterprise, Inc., Northeast Brooklyn* Housing *Development Corporation, Criminal Court of the City of New York, New York Design Architects, LLP, the People of the State of New York, the City of New York* (No. 502040/2016).  On July 6, 2017, a judgment of foreclosure on default was entered.  The judgment of foreclosure awarded the sum of $6,429,060.56 with default interest from January 12, 2017 plus fees and costs.  A foreclosure auction was scheduled for October 26, 2017.  Prior to the scheduled sale, the Debtor filed for relief under Chapter 11 to restructure the Debtor's outstanding debt obligations such that repayment would be possible to all creditors rather than a foreclosure sale for the sole benefit of 124 NY and to the detriment of all the Debtor's other creditors and its not-for-profit mission.  The events and circumstances precipitating the Debtor's filing are set forth more fully in the *Declaration of Jeffrey E. Dunston Pursuant to Local Bankruptcy Rule 1007-4* filed October 26,

2017 [Docket No. 6].

2.4        **Confirmation of the Plan.**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court will schedule a Confirmation Hearing as set forth above.  The Bankruptcy Court will set deadlines for objections, if any, to Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, and, if it the Bankruptcy Court determines that they have been, the Bankruptcy Court will enter an order confirming the Plan. The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing.  The Confirmation Order and the occurrence of the Effective Date would make the Plan binding upon the Debtor, all Creditors and other parties regardless of whether they accept the Plan.

## ARTICLE III

## THE PLAN

3.1        **Classification and Treatment of Claims.**

The table below provides a summary of the classification and proposed treatment of Claims under the Plan and a listing of unclassified Claims.  The figures set forth in the table below as to Claims are based on the Schedules, filed Claims, or other estimates made by the Debtor.  Estimates are as of the projected Effective Date, August 31, 2018.

| CLASS AND ESTIMATED AMOUNT | TYPE OF CLAIM | SUMMARY OF TREATMENT |
| --- | --- | --- |
| Unclassified<br><br>(Estimate: $110,000) | Administrative Claims (excluding Claims for Professional Compensation and Reimbursement of Expenses, including statutory United States Trustee fees). | **Non-voting.**  Each Allowed Administrative Claim except to the extent any entity entitled to payment has received payment on account of such Claim prior to the Effective Date or agrees to less favorable treatment, each Holder of an Allowed Administrative Claim will receive Cash from the Debtor in an amount equal to such Allowed Claim by the later of either (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) the date that is 14 days after the Administrative Claim is Allowed; or (iii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such Allowed Administrative Claim; provided, however, that any Allowed Administrative Claim incurred by the Debtor in the ordinary course of its business will be paid in full or performed by the |

| | | |
|---|---|---|
| | | Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.    Since by law holders of Allowed Administrative Claims must be paid in full, these claims are not classified and holders of Allowed Administrative Claims do not vote. |
| Unclassified (Estimate: $563,000.00) | Administrative Claims for Professional Compensation and Reimbursement of Expenses | **Non-voting.**  All Professionals seeking payment of Professional Fees incurred through and including the Effective Date will file their respective final applications on or before the date that is 45 days after the Effective Date.   Any such application timely filed will be deemed to be an Allowed Administrative Expense Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application. Since by law, holders of Administrative Claims for Professional Compensation and Reimbursement of Expenses must be paid in full to the extent Allowed, these claims are not classified and holders of Administrative Claims do not vote. |
| Unclassified (Estimate: $0) | Administrative Tax Claims | **Non-voting.**  All Administrative Tax Claims held by Governmental Units will be paid, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Unit as of the Effective Date.  These claims are not classified and holders of Administrative Tax Claims do not vote. |
| Unclassified (Estimate: $13,438.61) | Priority Tax Claims | **Non-voting.**   In full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, each Priority Tax Claim will be paid in full as of the Effective Date.  These claims are not classified and holders of Priority Tax Claims do not vote. |
| Class 1 (Estimate: $0) | Priority Claims (other than Priority Tax Claims and Administrative Claims) | **Unimpaired; Non-Voting.**  All Priority Claims will be paid in full on the Effective Date, or as soon as practicable after such claims become Allowed Claims.  These claims are unimpaired and do not vote. |
| Class 2 (Estimate: $177,806.10) | MTAG Secured Claim | **Unimpaired; Non-Voting.**  The MTAG Secured Claim will be either (i) paid in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the |

| | | |
|---|---|---|
| | | Debtor and the holder of such MTAG Secured Claim. Such claim is unimpaired and does not vote. |
| Class 3<br><br>(Estimate: $8,125,910.63) | 124 NY Secured Claim | **Unimpaired; Non-Voting**. The 124 NY Secured Claim will be an Allowed Claim to the extent it is not disputed and either (i) paid in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such 124 NY Secured Claim. Such claim is unimpaired and does not vote. |
| Class 4<br><br>(Estimate: $303,671.91) | Remaining Secured Claims besides MTAG Secured Claim and 124 NY Secured Claim | **Unimpaired; Non-Voting.** The Remaining Secured Claims will be either (i) paid in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holders of such Remaining Secured Claims. Such claims are unimpaired and do not vote. |
| Class 5<br><br>(Estimate: $78,470.96) | General Unsecured Claims | **Unimpaired; Non-Voting.** The General Unsecured Claims will be either (i) paid in full on the Effective Date (including interest estimated at 2.35%, the federal judgment rate per 28 U.S.C. § 1961, through the Effective Date), or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holders of such remaining Secured Claims. Such claims are unimpaired and do not vote. |
| Class 6<br><br>(Estimate: $940,269.56) | NEB Unsecured Claim | **Unimpaired; Non-Voting.** The NEB Unsecured Claim will be either quantified and any remaining funds shall be paid to NEB (i) on the Effective Date, or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of the NEB Unsecured Claim. Payment of the NEB Unsecured Claim will not be made unless and until all Allowed Class 5 General Unsecured Claims have been paid in full with interest. |

3.2     **Certain Other Provisions Related to Unclassified Claims.**

(a)     **Administrative Bar Date.** Except as otherwise provided in the Plan, requests for payment of Allowed Administrative Claims must be filed no later than the Administrative Claim Bar Date as set forth in the Confirmation Order. Holders of Allowed Administrative Claims that do not file requests for the payment on or before the Administrative Claim Bar Date, will be forever barred from asserting such Allowed Administrative Expense Claims against the Debtor or its property.

(b)    **Claims for Professional Fees and Reimbursement.**    All Professionals seeking payment of Professional Fees incurred through and including the Effective Date will file their respective final applications on or before the date that is 30 days after the Effective Date.  Any such application timely filed will be deemed to be an Allowed Administrative Expense Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application.

Objections to any Professional's application for compensation or reimbursement must be timely filed and served upon such Professional, and upon the Debtor, in accordance with the Bankruptcy Rules or any order entered by the Bankruptcy Court.  Upon entry of a Final Order approving an application, the fees will be paid within seven days thereafter or otherwise in accordance with the Plan or as agreed to by the Professional and the Debtor.

Funds will be reserved on the Effective Date for anticipated Professional Fees that may come to be due and payable pursuant to orders entered after the Confirmation Date.

As of the date of this Disclosure Statement, the estimated amounts of Professional Fees are as follows, as of August 31, 2018:

Archer & Greiner, P.C. - Counsel for the Debtor
$550,000.00 (estimate)

Sperber, Denenberg & Kahan, P.C. – Special Real Estate Counsel for the Debtor
$13,000.00 (estimate)

The funds to pay the approved amounts of such fees will be provided from the Implementation Funds.

(c)    **Statutory Fees.**  On the Effective Date, the Debtors will make all payments required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).  These fees are estimated at $110,000.00, based on $11,000,000.00 in disbursements.  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) after the Effective Date will be paid by the Reorganized Debtor on a quarterly basis until the Case is closed, converted, or dismissed.

3.3    **Executory Contracts and Unexpired Leases.**

(a)    **Generally.**  To the extent not (i) assumed in the Case prior to the Confirmation Date, (ii) rejected in the Case prior to the Confirmation Date, or (iii) specifically rejected pursuant to the Plan, the Confirmation Order will constitute an Order authorizing the assumption of all Executory Contracts and Unexpired Leases not previously assumed or rejected.

i.    The provisions (if any) of each Executory Contract or Unexpired Lease to be assumed under the Plan which is or may be in default will be satisfied solely by such cure amounts as may be found by the Bankruptcy Court.  In the event of a dispute regarding (i)

the nature or the amount of any cure, (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure will occur as soon as practicable following agreement of the parties or the entry of a Final Order resolving the dispute and approving the assumption of the Executory Contract or Unexpired Lease. The Debtor estimates no cure payments will be necessary with respect to any Executory Contract or Unexpired Lease.

ii.    Notwithstanding anything otherwise to the contrary, (i) nothing contained herein will constitute or be deemed to constitute a waiver or relinquishment of any right of the Debtor to object to any cure payments asserted and it will retain, reserve and be entitled to assert any objection or legal or equitable defense to any cure, and (ii) if a dispute relating to a cure remains unresolved or is resolved in a manner that the Debtor determines, in its sole discretion, does not protect its interests, the Debtor will be entitled to reject the Executory Contract or Unexpired Lease to which such cure dispute relates.

iii.    Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan, the Debtor will, consistent with the requirements of section 365 of the Bankruptcy Code, following the Effective Date, file and serve on parties to executory contracts or unexpired leases to be assumed and other parties in interest (the "Cure Notice") listing the proposed cure (including amounts of compensation for actual pecuniary loss) to be paid in connection with the assumption of all Executory Contracts or Unexpired Leases to be assumed. The parties to such Executory Contracts or Unexpired Leases to be assumed will have ten (10) days following service of the Cure Notice to object in writing to the cure proposed by the Debtor, and to propose an alternative cure. In the event that no objection is timely filed, the applicable party will be deemed to have consented to the cure proposed (including amounts of compensation for actual pecuniary loss) by the Debtor and will be forever enjoined and barred from seeking any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code from the Debtor, its Estate, the Debtor or any assignee of the contract or lease. If an objection is timely filed with respect to an Executory Contract or Unexpired Lease, the Bankruptcy Court will hold a hearing to determine the amount of any disputed cure amount not settled by the parties. Notwithstanding anything otherwise to the contrary, at all times through the date that is five Business Days after the Bankruptcy Court enters an order resolving and fixing the amount of a dispute cure amount, the Debtor will be authorized to withdraw its motion to assume and reject such Executory Contract or Unexpired Lease by notice to the non-Debtor party to such Executory Contract or Unexpired Lease. Any cure payment will be paid out of the proceeds of the Sale and to the extent such remain available.

(b)    **Rejection Claims.** Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor will be treated as General Unsecured Claims.

(c)    **Bar to Rejection Claims.** A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease will not be timely unless it is filed with the Bankruptcy Court and served so that it is

received by the Debtor within 30 days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim will be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Effective Date.  Any such Claim not timely filed and served will be forever barred from assertion and may not be enforced against the Debtor, its successors or properties.

## ARTICLE IV

## SIGNIFICANT EVENTS IN THE CASE

4.1      **Professional Retentions.**

On December 7, 2017, the Court entered an order approving the retention of DiConza Traurig Kadish LLP as counsel to represent the Debtor in this Case pursuant to section 327(a) of the Bankruptcy Code [Docket No. 39].  The practice of DiConza Traurig Kadish LLP was merged, and on April 22, 2018, the Court entered an order approving the substitution of Archer & Greiner, P.C. as counsel to represent the Debtor in this Case pursuant to section 327(a) of the Bankruptcy Code [Docket No. 85].

On January 16, 2018, the Court entered an order approving the retention of Mortgage EquiCap LLC as mortgage broker for the Debtor pursuant to sections 327 and 328(a) of the Bankruptcy Code [Docket No. 55].

On March 23, 2018, the Court entered an order authorizing the retention of TerraCRG LLC as lease broker for the Debtor pursuant to sections 327 and 328(a) of the Bankruptcy Code [Docket No. 82].

On May 22, 2018, the Court entered an order authorizing the retention of Keen-Summit Capital Partners LLC as lease broker for the Debtor pursuant to sections 327 and 328(a) of the Bankruptcy Code [Docket No. 106].

On June 18, 2018, the Debtor submitted an application for an order authorizing the retention of Sperber, Denenberg & Kahan, P.C. as special real estate counsel for the Debtor pursuant to section 327(e) of the Bankruptcy Code [Docket No. 108].

4.2      **Motions.**

On November 15, 2017, the Debtor filed a motion for an order to authorize the use of cash collateral. [Docket No. 21].

On November 15, 2017, the Debtor filed a motion for an order granting authority to continue utility services and to provide an adequate assurance payment to the Debtor's utility providers. [Docket No. 22].  On January 14, 2018, the Court entered an order granting authority to continue utility services and to provide an adequate assurance payment to the Debtor's utility providers [Docket No. 54].  The Debtor complied therewith.

On December 6, 2017, 124 NY filed a motion to dismiss the case or convert the case to one under Chapter 7 of the Bankruptcy Code under section 1112(b), or for relief from the automatic stay under sections 326(d)(1) and 362(d)(3). [Docket No. 34]. On January 11, 2018, the Debtor filed its response and objection [Docket No. 51]. On February 14, 2018, the Debtor filed its supplemental response and objection [Docket No. 74].

On January 24, 2018, the Debtor filed its Plan of Reorganization [Docket No. 63] and Disclosure Statement in Support of Plan of Reorganization [Docket No. 62], in compliance with its obligations as a "single asset" real estate debtor.

On February 14, 2018, the Debtor filed its *Motion for an Order (I) Approving Debtors Disclosure Statement; (II) Approving Form and Manner of Notices and Ballots; (III) Approving Solicitation Materials and Solicitation Procedures; (IV) Fixing a Record Date and Establishing a Voting Deadline, and (V) Scheduling Hearing on Confirmation of Plan* [Docket No. 72].

On April 30, 2018, the Debtor filed a motion for an order authorizing the Debtor to enter into a fire protection system maintenance agreement with Imperial Fire Protection Systems, Inc. [Docket No. 92].

On April 30, 2018, the Debtor filed a motion for an order authorizing the Debtor to enter into a certain settlement and lease termination agreement with Him & Her Salon LLC [Docket No. 93]. On June 11, 2018, the Court entered the order and payment was tendered thereafter [Docket No. 107].

On May 4, 2018, the Debtor filed its *Amended Motion for Orders (a)(i) Approving Sale Procedures; (ii) Approving Stalking Horse Protections (iii) Scheduling Auction and Hearing Dates to Consider Sale of Certain Assets; (iv) Approving Form and Manner of Notice of Sale Procedures and Notice of Potential Assumption, Assignment, and/or Sale of Contracts and Leases; and (v) Granting Related Relief; and (b)(i) Authorizing the Sale of Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests (ii) Authorizing the Assumption, Assignment, and/or Sale of Certain Executory Contracts and Unexpired Leases Related Thereto; (iv) Providing for Payment of Sale Proceeds to Secured Lender; and (v) Granting Related Relief* [Docket No. 100] (the "Amended Sale Procedures Motion"). On May 8, 2018, a hearing was held on the Amended Sale Procedures Motion. No objections were filed prior to the hearing. The proposed order approving sale procedures was negotiated between the Debtor and 124 NY and was submitted but not entered.

The issues raised in the Debtor's cash collateral motion, the 124 NY motion to dismiss, the Amended Sale Procedures Motion, and the Debtor's motion to authorize agreement with Imperial Fire Protection Systems, Inc. have been adjourned from time to time and will be resolved by entry of a Confirmation Order.

4.3      **Reorganization Attempts.**

The Debtor spent the better part of its time in chapter 11 seeking to refinance the Original Mortgage.  The Debtor negotiated with several parties with respect to a potential refinance.  However, upon the Court's direction to implement a bidding procedures protocol and the retention of Keen-Summit Capital Partners LLC, an offer to pay more than the sum of all Claims was obtained.  Thus the Sale Contract was negotiated and the Plan proposed, centered around the Sale.

4.4      **Monthly Operating Reports.**

Monthly operating reports have been filed on a monthly basis and are publicly available.

4.5      **Office of the United States Trustee Fees.**

Statutory fees have been paid on a quarterly basis to the office of the United States Trustee.

4.6      **Claims Bar Date.**

On January 7, 2018, the Bankruptcy Court entered an order setting a General Bar Date of March 9, 2018 at 5:00 p.m., for persons and entities, and April 24, 2018 at 5:00 p.m., for Governmental Units, thereby setting the deadlines by which the Debtor's Creditors must file proofs of claim for alleged liabilities not paid and/or damages incurred arising from or related to periods prior to the Petition Date [Docket No. 49].

As of the General Bar Date five secured claims were filed, asserting $7,579,013.49, and six unsecured claims, asserting $107,294.75.

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.1      **Means of Implementation**.

(a)      **Sale Proceeds.**  The Debtor and the Purchaser will close on the Sale of the Building on the terms set forth and according to the documents attached as Exhibit "5.1(a)-1" hereto including the Sale Contract.  Such Sale will require approval by the Office of the New York Attorney General.  **The Sale proceeds are the source of the Implementation Funds and therefore, all distributions depend upon the closing and funding of the Sale**.  The proposed purchaser is a special purpose entity organized by Mark Tress and Joseph Tabak who assert that they are sophisticated real estate investors and own multiple properties throughout New York City and elsewhere.  Mr. Tress regularly purchases distressed properties in bankruptcy, and Mr. Tabak is the lead principal of Princeton Holdings LLC located in New York City. The principals assert that they have the financial resources to consummate the transaction once the necessary Court and Attorney General approvals are obtained.  A $1,000,000.00 deposit will be provided

15

as liquidated damages for failure of the Purchaser to close.

In summary, the terms of the private Sale are as follows.  The Sale Contract provides for the Sale of the Building on an "as is" "where is" basis.  The Sale Contract is for all of Debtor's right, title and interest in and to the Building, together with all related fixtures, improvements and development rights, and subject to all zoning, landmarking and other potential restrictions.  The Sale Contract also includes the Debtor's assumption and assignment of all commercial leases designated by the Purchaser.  The Sale Contract does not include the Debtor's other property including books and records, cash, deposits with third parties, intellectual property, goodwill, tax attributes, claims and causes of action.  The Sale shall be free and clear of all liens, claims, interests, taxes and non-permitted encumbrances pursuant to sections 363(b) and (f), 1123(a)(5)(D) and 1129 of the Bankruptcy Code.  The Purchase Price (as defined in the Sale Contract) will be the sum of (i) the amount necessary to pay all Allowed Administrative, Professional, Priority, Secured, and Unsecured claims and costs of closing in the Case in Cash, in full, from the proceeds of Sale (the "100-cent Plan Amount"); and (ii) the difference between the 100-cent Plan Amount and $12,000,000.00 (the "Charitable Contribution").  The Charitable Contribution will be paid to the Debtor's sole member, NEB, a 26 U.S.C. § 501(c)(3) organization, as a charitable contribution.

The Debtor and Purchaser will bear their respective closing costs and expenses consistent with customary practices. The Debtor will pay all brokerage fees from the Sale proceeds upon Court approval as appropriate.  The Purchaser has represented that the sole broker who introduced the Purchaser to the property and worked with the Purchaser on this Sale was Keen-Summit Capital Partners LLC and no other broker.  To the extent any closing costs or obligations are not capable of being paid at closing, such costs will be escrowed or retained upon the agreement of the parties or otherwise as the Court may direct, to be paid promptly as allowed or fixed.

(b)    **Rent Proceeds and Cash on Hand.**  Rent proceeds and Cash on hand are property of the Debtor and may also be used as Implementation Funds to fund and implement the Plan as available.

(c)    **Sources and Uses.**  An estimate of the sources and uses of the Implementation Funds is attached hereto as Exhibit "5.1(c)."

5.2    **Preservation of Rights of Action**. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Debtor will retain, and in accordance with its determination of the best interest of the Estate, may enforce any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor or the Estate as of the Petition Date, and arising under any provision of state or federal law, or any theory of statutory or common law or equity, including, but not limited to, any cause of action asserted, or which may hereafter be asserted.  Any recovery received by the Debtor through the prosecution, settlement or collection of any such claim, right or cause of action, will be retained by the Debtor following the satisfaction of all other Allowed Claims under the terms of the Plan.  A *non-exclusive* schedule of specific rights of action preserved is attached hereto as Exhibit "5.2."

5.3     **Stamp Tax.**  Under the Plan, pursuant to the fullest application of section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, will not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.

5.4     **Modification and Revocation of the Plan**.  The Plan may be altered, amended or modified by the Debtor at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Section 1127 of the Bankruptcy Code authorizes the proponent of a Chapter 11 plan to modify such plan at any time prior to confirmation of the plan so long as the plan, as modified, continues to meet certain technical requirements of sections 1122 and 1123 of the Bankruptcy Code with respect to the classification of claims and the contents of a plan.  Prior to confirmation, if a debtor files modifications to a plan, pursuant to section 1127(a) of the Bankruptcy Code "the plan as modified becomes the plan."  No order of the court is required to modify the plan under the terms of section 1127(a) of the Bankruptcy Code; however, the proponent of a modification to a plan must comply with section 1125 of the Bankruptcy Code with respect to the plan as modified.  In other words, if a modification materially alters the treatment of any Creditor who has accepted the plan, the debtor will be required to make additional disclosures to those Creditors whose treatment has been materially and adversely altered and give such creditors an opportunity to change their votes.

        The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan will be null and void, and nothing contained in the Plan will constitute a waiver or release of any Claims by or against, or any interest in, the Debtor; or prejudice in any manner the rights of the Debtor.

5.5     **Retention of Jurisdiction.**

        The Plan contains detailed provisions providing for the retention of broad jurisdiction by the Bankruptcy Court over the Plan and this Case for the purposes of, *inter alia*, determining all disputes relating to Claims, resolving all matters presented by or arising under the interpretation, implementation or enforcement of the Plan and to determine all other matters pending on the Effective Date.

## ARTICLE VI

## ACCEPTANCE AND CONFIRMATION

6.1     **Requirements for Confirmation.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court is expected to enter an order confirming the Plan.  These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interest" of all Creditors, (vi) the Plan is feasible and (vii) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.**  The so-called "best interest" test requires that each impaired Creditor either (a) accepts the Plan, or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such Entity would receive or if the Debtor's property were to be liquidated under chapter 7 of the Bankruptcy Code.

Under the Plan, all Allowed Unsecured Creditors will receive Cash equal to 100% of their Allowed Claims. A 100% return to Creditors on account of their Allowed Claims would not be assured in a liquidation such as the foreclosure described in section 2.3 above.

To determine what the holders in each Impaired Class of Claims would receive if the Debtor were liquidated (under chapter 7 or otherwise), the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case.  The amount that would be available for satisfaction of Allowed Claims against the Debtor would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the Cash held by the Debtor at the commencement of the chapter 7 case. Such amount would be reduced by the amount of any Claims secured by the Debtor's assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the chapter 7 case.

The costs of liquidation under chapter 7 or otherwise would become Administrative Claims with the highest priority against the proceeds of liquidation after payment of Allowed Secured Claims.  Such costs would include the fees payable to a chapter 7 trustee or other liquidation agent, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other Professionals that such trustee may engage to assist in the liquidation.  In addition, liquidation costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts

entered into by the Debtor during the pendency of the Case in chapter 11. After satisfying Administrative Claims arising in the course of the liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time this Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor. Given the foregoing a chapter 7 trustee might consider abandoning the assets to the secured creditor resulting in a foreclosure scenario and no return on Unsecured Claims.

After consideration of the effects that a liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a liquidation arising from fees payable to the trustee (or liquidating agent), (ii) the erosion in value of the Debtor's assets in the context of the expeditious liquidation and the "forced sale" atmosphere that would prevail, and (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of General Unsecured Creditors, the Debtor firmly believes that if its property were to be liquidated there would be no assurance of recovery or the timing thereof to holders of Unsecured Claims because any recovery would be dependent upon the uncertain outcome of a forced sale of the Building. Any such sale would likely return value only on the MTAG Secured Claim and the 124 NY Secured Claim while prejudicing all other secured and unsecured Creditors.

(a)    **Liquidation Analysis.**

As discussed in the foregoing section under the "Best Interest Test," the Plan provides for the payment in full of all Allowed Secured, Administrative, Priority and Unsecured Claims (except NEB) but there can be no such assurance if the Building were to be liquidated in a liquidation proceeding.

(b)    **Feasibility.**

For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor other than as contemplated by the Plan. The Debtor believes that the Plan is feasible and not reasonably likely to be followed by resort to further reorganization or liquidation under the supervision of the Bankruptcy Court. As discussed above, the Debtor has, with the real estate advisory services of Keen-Summit Capital Partners LLC, located the Purchaser. The Debtor and the Purchaser have agreed upon a Purchase Price that will provide the necessary Implementation Funds. The Purchase Price is the 100-cent Plan Amount plus the Charitable Contribution to equal $12,000,000.00. The contemplated transaction is for an "as is" "where is" sale, free and clear of all liens, claims and encumbrances, with no financing or any other contingencies available to the Purchaser. Such Sale will require approval by the Office of the New York Attorney General. Upon consideration of all the terms of the proposed Sale, a closing date (and Effective Date) of August 31, 2018 is projected.

Upon the signing of the Contract of Sale by both parties, the sum of $1,000,000.00 will be deposited by the Buyer via wire or official bank check into the Debtor's

special real estate counsel's escrow account ("Earnest Money Deposit").  The Earnest Money Deposit is to stand as liquidated damages in the event of a failure to close upon or after a reasonable extension of a closing date.  Any extension of the closing date, not to exceed one 30 day extension, will be subject to and conditioned upon the Purchaser bearing accruing interest and real estate taxes related to the extension period.

Upon the Sale and satisfaction of the 124 NY Allowed Secured Claim, 124 NY will dismiss the Foreclosure Action with prejudice, upon appropriate notice to (i) the Debtor, and (ii) NEB.

(c)    **Confirmation with the Acceptance of Each Impaired Class.**

A plan may be confirmed if each impaired class of claims accepts the plan.  Classes of claims which are not impaired are deemed to have accepted the plan.  A class is impaired if the legal, equitable or contractual rights attaching to the claims of that class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of claims impaired by a plan are entitled to vote by submitting ballots accepting or rejecting the plan.  Holders of claims not impaired by a plan are deemed to accept the plan, and may not vote to accept or reject the plan.  Holders of claims that would neither receive nor retain any property under a plan would be deemed to reject the plan.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of claims of that class.  Only those claims, the holders of which actually vote to accept or reject the plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

With respect to unsecured claims, the absolute priority rule allows the confirmation of a plan over the rejection of a class of unsecured claims if the holder of any claim that is junior to the claims of such class will not receive or retain any distribution under the plan on account of such junior claim or interest any property.

Given the payment in full in each Class (except possibly NEB, which is classified in the junior-most Class and which expressly consents to the Plan), no votes are necessary.

(d)    **Confirmation Without the Acceptance of Each Impaired Class.**

In the event that any impaired class of claims does not accept a plan, the Bankruptcy Court may nevertheless confirm the plan at the debtor's request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired class of claims votes to accept the Plan without regard to any vote cast on account of a claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired class which

has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting class.  The debtor requests that the court confirm the plan over the rejection of any non-accepting class in the event all other elements of section 1129(a) of the Bankruptcy Code are satisfied; there are no Classes solicited to vote on this Plan.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its claims.  The Debtor believes that under the Plan the class of Impaired Claims is treated in a manner that is consistent with the treatment of other classes of Claims with which their legal rights are intertwined, if any, and no class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such class.  The Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims, and the Plan is legally confirmable.

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule."  Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired class of claims that has not accepted the plan must be paid in full if a more junior class receives any distribution under the plan.

With respect to unsecured claims, the absolute priority rule allows the confirmation of a plan over the rejection of a class of unsecured claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.  Under the Plan, all Allowed Claims are to be paid 100-cents plus interest subject to certain limitations set forth herein.  Therefore, except with regard to NEB in Class 6, there are no Impaired Classes.  NEB has consented to its treatment under the Plan.  No Creditor is entitled to vote on the Plan, and all Creditors are deemed to accept the Plan.

## ARTICLE VII

## EFFECT OF CONFIRMATION

7.1     **Post-Effective Date Reorganized Debtor.**

The Reorganized Debtor is empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan, (ii) make all Distributions contemplated hereby, (iii) employ and compensate professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Reorganized Debtor by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Reorganized Debtor to be necessary and proper to implement the provisions thereof.  After the Effective Date, and even upon closing of the Case, the Reorganized Debtor

shall remain as a reorganized entity free of the constraints of the Bankruptcy Code and operating under applicable state law.  The pre-petition directors, Jeffrey Dunston and Nathaniel Montgomery, will remain as post-Effective Date directors of the Debtor.  NEB will continue to administer the daily operations of the Debtor post-Effective Date.

7.2      **Closing of Case.**

After the Effective Date and upon all distributions having been made including payment of Professional Fees and payment of the Charitable Contribution to NEB, and the Case having been fully administered, the Case will be closed.

7.3      **Injunction**.

(a)      Except (i) as otherwise provided in the Plan, (ii) as otherwise provided under Final Order entered by the Bankruptcy Court or (iii) with respect to the Debtor's obligations under the Plan, the occurrence of the Effective Date will forever stay, restrain and permanently enjoin on and after the Effective Date (1) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Building or the Debtor's other assets, to prevent or stay any person from carrying out the transactions set forth in this Plan or to interfere with any such transactions, (2) the creation, perfection or enforcement of any lien or encumbrance against the Building or the Debtor's other assets or (3) any Claim discharged under the Confirmation Order, this Plan or pursuant to section 1141(d)(1) of the Bankruptcy Code as against the Building or the Debtor's  other assets.

(b)      Except as otherwise provided in the Plan or the Confirmation Order, the entry of the Confirmation Order, will constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset from the Building or the Debtor's other assets.

(c)      Nothing contained in the Plan or the Confirmation Order will enjoin, limit or restrict in any manner the Reorganized Debtor, from administering, enforcing, collecting or taking any other action after the Effective Date.

(d)      Any violation of the foregoing provisions by any party will subject the offending party to appropriate sanctions for violation of the within injunction, including, without limitation, damages, attorneys' fees, costs and disbursements.

(e)      The Bankruptcy Court will retain exclusive jurisdiction, and the Order confirming this Plan shall provide that jurisdiction of the Bankruptcy Court will survive the confirmation of this Plan for the purpose of enforcing all of the Plan provisions, including, without limitation, disputes relating to the interpretation and enforcement of Plan provisions.

7.4      **Limitation of Liability**.  Pursuant to section 1125(e) of the Bankruptcy Code, neither the Debtor, nor any of its respective members, officers, managers, directors, agents or employees (acting in such capacity) nor any attorney or other Professional employed by any of them, will have or incur any liability to any entity for any action taken or omitted to be taken in connection

with or related to the formulation, preparation, prosecution, dissemination, confirmation, consummation or administration of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or the distribution of property under the Plan, except as may be expressly provided for in such agreements or documents, and except for willful misconduct or gross negligence.

7.5     **Plan and Confirmation Order as Release.**  From and after the Effective Date, a copy of the Confirmation Order and this Plan will constitute and may be submitted as a complete defense to any claim or liability released.

7.6     **Discharge.**

        Except as otherwise provided in the Plan, all parties will be precluded and enjoined from asserting against the Debtor, and its respective successors, assets or properties, or against any property that is distributed, or is to be distributed under the Plan (including but not limited to the Building) any other or further Claim based upon any acts or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

        Except as otherwise provided under the Plan, or a Final Order of the Bankruptcy Court, any judgment at any time obtained, to the extent that such judgment is a determination of the liability of the Debtor with respect to any debt discharged pursuant to the Plan, will be null and void and of no force and effect, regardless of whether a Proof of Claim therefor was filed or deemed filed and, except as otherwise provided in the Plan, all Creditors holding Claims against the Debtor, will be precluded from asserting against the Debtor, and any of its assets including the Building, or any property distributed under the Plan, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, and, upon the Effective Date, the Confirmation Order will permanently enjoin all Creditors and their successors and assigns, from enforcing or seeking to enforce any such Claims against the Debtor.

7.7     **Releases**

        Section 1125(e) of the Bankruptcy Code protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan.  Pursuant to section 1125(e), neither the Debtor, nor any of their respective members, officers, managers, directors, agents or employees (acting in such capacity) nor any attorney or Professionals employed by any of them, will have or incur any liability to any person or entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, prosecution, dissemination, Confirmation, consummation or administration of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or the distribution of property under the Plan, or any other action taken or omitted to be taken in connection with the Case or the Plan, except as may be expressly provided for in such agreements or documents, and except for willful misconduct or gross negligence.  From and after the Effective Date, a copy of the Confirmation Order and the Plan will constitute and may be submitted as a complete defense to any claim or liability released

pursuant to the Plan.

(a)    **Debtor Release.**  The Plan provides that on the Effective Date, each Creditor will be deemed to have irrevocably waived, released and discharged the Debtor and its affiliates and any of its respective officers, managers, directors, employees, members, partners, representatives, attorneys, Professionals, predecessors, successors and assigns (collectively, the "Debtor Released Parties") from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan; provided, however, that the foregoing release will not constitute a release of the Debtor from any of its obligations under the Plan.

(b)    **NEB Release.**  In consideration for its subordinated treatment in Class 6 of the Plan, and for other good and valuable consideration, the Plan provides that on the Effective Date, the Debtor and each Creditor will be deemed to have irrevocably waived, released and discharged NEB and its affiliates and any of its respective officers, managers, directors, employees, members, partners, representatives, attorneys, predecessors, successors and assigns from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, arising in connection with any claims or obligations on behalf of the Debtor and each Creditor that arose or occurred on or prior to the Effective Date.

(c)    **Exculpation.**  Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either of the Debtor Release or NEB Release (each as described above), and except as otherwise specifically provided in the Plan, the Debtor Released Parties are exculpated by and with respect to all parties (including the Debtor, Creditors and NEB) from claims, liabilities, suits, actions and threatened actions, whether in law or in equity, that may have existed prepetition or action taken postpetition or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, implementing, or consummating the Plan or the Case.

## ARTICLE VIII

## ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or otherwise, (b) the dismissal of this Case or relief from the stay in favor of 124 NY and the resulting continuation of the Foreclosure Action and sale by 124 NY, or (c) the promulgation and confirmation of an alternative plan of reorganization.  As discussed under the section entitled "Best Interest Test," under alternatives (a) and (b) above, there would be no assurance of recovery or the timing thereof to Creditors holding Unsecured Claims because any recovery would be dependent upon the uncertain outcome of a straight foreclosure or forced sale of the Building.  The Plan provides

the greatest likelihood for a substantial recovery by the Creditors.

## ARTICLE IX

## <u>CERTAIN FEDERAL INCOME TAX CONSEQUENCES</u>

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Unsecured Claim. This summary does not cover all potential U.S. federal income tax consequences that could possibly arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Unsecured Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. *Holders of Allowed Claims should consult their own tax advisor as to the Plan's specific federal, state, local and foreign income and other tax consequences.*

In accordance with the Plan, each holder of an Allowed Claim (a "Creditor") will be entitled to payment on its Allowed Claim in full . Each such Creditor will recognize gain or loss upon the receipt of payment equal to the difference, if any, between the "amount realized" by such Creditor and the Creditor's adjusted basis in his, her or its Allowed Claim. The "amount realized" is equal to the value of such Creditor's payments.  Any gain or loss realized by such a Creditor should constitute ordinary income or loss to him, her or it unless the Allowed Claim is a capital asset.  If an Allowed Claim is a capital asset, and it has been held for more than one year, such Creditor will likely realize long term capital gain or loss.

The tax consequences to holders of claims will differ and will depend on factors specific to each Creditor, including but not limited to: (i) whether the Creditor's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Creditor's Claim; (iii) the type of consideration received by the Creditor in exchange for the Allowed Claim; (iv) whether the Creditor is a United States person or foreign person for tax purposes; whether the Creditor reports income on the accrual or cash basis method; and (v) whether the Creditor has taken a bad debt deduction or otherwise recognized loss with respect to an Allowed Claim.

THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER.  FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT, NOTWITHSTANDING THE DESCRIPTION ABOVE, EACH CREDITOR CONSIDER, AND OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.

THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR FOR THE PURPOSE OF AVOIDING TAX CONSEQUENCES OR PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH HOLDER SHOULD SEEK ADVICE BASED UPON THE CREDITOR'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

10.1    **Orders in Aid of Consummation**. Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

10.2    **Compliance with Tax Requirements**. In connection with the Plan, the Debtor and the Reorganized Debtor, will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan will be subject to such withholding and reporting requirements; provided, however, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

10.3    **Due Authorization by Creditors.** Each and every Creditor who accepts a distribution provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

10.4    **Amendments.** The Plan may be altered, amended or modified by the Debtor, in writing and signed by the Debtor, at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

10.5    **Revocation.** The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan will be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor or its Estate.

10.6    **Filing of Additional Documents.** Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

10.7    **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

10.8 **Successors and Assigns.** The rights, benefits and obligations of any Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or permitted assign of such Entity.

10.9 **Notices.** All notices and other communications to be given or made hereunder must be in writing and will be deemed to have been given or made when mailed or as otherwise set forth herein:

> **If to the Debtor, at:**
>
> Voras Enterprise Inc.
> Attn: President and Chief Executive Officer
> 132 Ralph Avenue
> Brooklyn, New York 11233
>
> -and-
>
> Archer & Greiner, P.C.
> *Counsel for Voras Enterprise Inc.*
> Attn: Allen G. Kadish, Esq.
>       Harrison H.D. Breakstone, Esq.
> 630 Third Avenue
> New York, New York 10017
>
> **If to NEB, at:**
>
> Northeast Brooklyn Housing Development Corporation
> Attn: President and Chief Executive Officer
> 132 Ralph Avenue
> Brooklyn, New York 11233
>
> **If to Purchaser, at:**
>
> Goldberg Weprin Finkel Goldstein LLP
> *Counsel for 619 Throop Acquisitions LLC*
> Attn: Kevin Nash, Esq.
> 1501 Broadway, 22nd Floor
> New York, New York 10036

Notices to any Creditor will be at (i) the addresses set forth on the respective Proofs of Claim filed by such holder; (ii) the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related Proof of Claim; (iii) the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Reorganized Debtor has not received a written notice of a change of address; or (iv) the address reflected in the Schedules if no Proof of Claim is filed and the Reorganized Debtor has not received a written notice of a

change of address.

10.10    **Governing Law**.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

10.11    **Other Actions**.  On the Effective Date, and without limitation by any other provision of the Plan, the amendment of the Debtor's bylaws as may be appropriate, the bylaws of Reorganized Debtor, and all other actions and documents contemplated to be taken or executed on the Effective Date, will be authorized and approved in all respects pursuant to this Plan.  In order to effectuate the transactions set forth in the Plan the Reorganized Debtor may reincorporate or a new entity may be formed, consistent with the Plan, to serve as the Reorganized Debtor.  All matters provided for in this Plan involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with this Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by officers, directors and employees of the Debtor or Reorganized Debtor. On the Effective Date, the appropriate officers and directors of the Reorganized Debtor are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of Reorganized Debtor without the need for any required approvals, authorizations, or consents, except and solely to the extent provided for in this Plan. Nothing contained herein shall prevent the Debtor from taking such actions as may be reasonably necessary to consummate this Plan, although such actions may not specifically be provided for within this Plan.

10.12    **Not-For-Profit Status.**  The Reorganized Debtor may continue at its option as a New York not-for-profit corporation.

10.13    **Severability**.  In the event any provision of this Plan is determined to be unenforceable such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of this Plan.

10.14    **Business Day**.  In the event that this Plan requires an act to be performed on a day that is not a Business Day, such act will be performed on the first Business Day thereafter.

10.15    **Amendment of Bylaws.**  Pursuant to section 1123(a)(5)(I) of the Bankruptcy Code, the Debtor's bylaws and operating budget cash requirements will be deemed amended as of the Effective Date, to the extent necessary, to implement the terms of this Plan.

10.16    **Reorganized Debtor.**  The Debtor, on and after the Effective Date will be referred to as the Reorganized Debtor.

## ARTICLE XI

## <u>ADDITIONAL INFORMATION</u>

Requests for information and additional copies of this Disclosure Statement, the Plan and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to Debtor's counsel:

ARCHER & GREINER, P.C.
*Counsel for Voras Enterprise Inc.*
Attn: Allen G. Kadish
Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents in this Case are on file in the Office of the Clerk of the United States Bankruptcy Court at the United States Bankruptcy Court, 271-C Cadman Plaza East, Brooklyn, New York 11201, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m. Additionally, copies of all pleadings, orders, lists, schedules, proofs of claim or other documents in this case may be viewed and printed over the Internet from the Bankruptcy Court's Electronic Case Filing system at http://www.nyeb.uscourts.gov.

# ARTICLE XII

## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors and strongly encourages all holders of Claims against the Debtor to support confirmation thereof.

Dated:  New York, New York
       June 19, 2018

VORAS ENTERPRISE INC.
Debtor and Debtor-in-Possession


By:   s/ Jeffrey Dunston
    Jeffrey Dunston
    President and Chief Executive Officer


ARCHER & GREINER, P.C.


By:   s/ Allen G. Kadish
    Allen G. Kadish
    Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017
Tel:  (212) 682-4940
Fax:  (212) 682-4942
Email:    akadish@archerlaw.com
        hbreakstone@archerlaw.com

*Counsel for Voras Enterprise Inc.,*
*Debtor and Debtor-in-Possession*

**Index to Exhibits**

**Exhibit 5.1 (a) :**      **Contract of Sale**

**Exhibit 5.1 (c):**      **Projected Sources and Uses**

**Exhibit 5.2:**      **Causes of Action**

**<u>Exhibit 5.1(a)</u>**

**Contract of Sale**

154 Contract of sale for New York office, commercial and multi-family residential premises. 2-95
Prepared by the Real Property Committee of the Association of the Bar of the City of New York

NOTE: This form is intended to cover matters common to most transactions. Provisions should be added, altered or deleted to
suit the circumstances of a particular transaction.

## Contract of Sale - Office, Commercial and Multi-Family Residential Premises

### Table of Contents

Section  1. Sale of premises and acceptable title
Section  2. Purchase price, acceptable funds, existing mortgages, purchase money mortgage, escrow of downpayment and foreign persons
Section  3. The closing
Section  4. Representations and warranties of seller
Section  5. Acknowledgments of purchaser
Section  6. Seller's obligations as to leases
Section  7. Responsibility for violations
Section  8. Destruction, damage or condemnation
Section  9. Covenants of seller
Section 10. Seller's closing obligations
Section 11. Purchaser's closing obligations
Section 12. Apportionments

Section 13. Objections to title, failure of seller or purchaser to perform and vendee's lien
Section 14. Broker
Section 15. Notices
Section 16. Limitations on survival of representations, warranties, covenants and other obligations
Section 17. Gains tax and miscellaneous provisions
Signatures and receipt by escrowee
Schedule A. Description of premises (to be attached)
Schedule B. Permitted exceptions
Schedule C. Purchase price
Schedule D. Miscellaneous
Schedule E. Rent schedule (to be attached)

CONTRACT dated the 18th day of JUNE, 2018 between

**VORAS ENTERPRISE INC.**, a New York not-for-profit corporation, having an address at c/o Archer & Greiner, 630 Third Avenue, New York, NY 10017 ("Seller")

and

**619 THROOP ACQUISITION LLC**, a New York limited liability company, having an address at c/o Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd floor, New York, New York 10036 ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

### Section 1. Sale of Premises and Acceptable Title

§1.01. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; and (e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as 601-619 Throop Avenue, Brooklyn, New York 11216 (Block 1856, Lot 1).

§1.02. Seller shall convey, and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract and free and clear of all claims, liens and taxes pursuant to 11 U.S.C. § 363(b) and (f) and § 1123, under a confirmed plan of reorganization and pursuant to an Order of the Bankruptcy Court, which becomes final subject only to: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any title insurer licensed to do business by the State of New York) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) shall be accepted by any lender described in Section 274-a of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Down payment and Foreign Persons

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto.

§2.02. All monies payable under this contract, unless otherwise specified in this contract, shall be paid by (a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York or (b) wire or official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of one-half of one percent of the Purchase Price shall be acceptable for sums payable to Seller at the Closing.

§2.03. (a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required thereunder prior to the Closing, is less than the aggregate amount of the Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.

(b) If any of the documents constituting the Existing Mortgage(s) or the note(s) secured thereby prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the terms of the Existing Mortgage(s) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall notify such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contract, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other in an effort expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require as a condition of the granting of such consent (i)

~~that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser is willing to pay such additional consideration or (ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02. If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02 if any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s).~~

~~§2.04. (a) If Schedule C provides for payment of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the most recent forms of the New York Board of Title Underwriters for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefor and the filing fees for any financing statements delivered in connection therewith.~~

~~(b) If Schedule C provides for the acceptance of title by Purchaser subject to Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that (i) the rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not be greater than the rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing, and (ii) if the principal amount of the Refinanced Mortgage plus the principal amount of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal payments due thereunder in inverse order of maturity. The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements reasonably required by the mortgagor to confirm such subordination.~~

~~(c) The Purchase Money Mortgage shall contain the following additional provisions:~~

~~(i) "The mortgagor or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness together with accrued interest, but without penalty, at any time on or after [insert the day following the last day of the fiscal year of the mortgagee in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date], on not less than 10 days written notice to the holder hereof."~~

~~(ii) "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach of or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor, disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."~~

~~(iii) "In addition to performing its obligations under Section 274-a of the Real Property Law, the mortgagee, if other than one of the institutions listed in Section 274-a, agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (a) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."~~

~~(iv) All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as either party may have designated in a notice given to the other party or parties in accordance with the provisions hereof."~~

~~(v) The additional provisions, if any, specified in a rider hereto.~~

§2.05. (a) If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid ~~by check or checks drawn to the order of and delivered to Seller's attorney or other escrow agent~~ ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a IOLA bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-bearing account, but ~~if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon.~~ The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located or with any Court of competent jurisdiction, including the Bankruptcy court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

§2.06. In the event that Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or in the event that Seller fails to deliver the certification of non-foreign status, required under § 10. 12(c), or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price a sum equal to ten percent (10%) thereof and shall at Closing remit the withheld amount with Forms 8288 and 8288A (or any successors thereto) to the Internal Revenue Service; and if the cash balance of the Purchase Price payable to Seller at the Closing after deduction of net adjustments, apportionments and credits (if any) to be made or allowed in favor of Seller at the Closing as herein provided is less than ten percent (10%) of the Purchase Price, Purchaser shall have the right to terminate this contract, in which event Seller shall refund the Downpayment to Purchaser and shall reimburse Purchaser for title examination and surveys costs as if this contract were terminated pursuant to §13.02. The right of termination provided for in this §2.06 shall be in addition to and not in limitation of any other rights or remedies available to Purchaser under applicable law.

Section 3. The Closing

§3.01. Unless as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

Section 4. Representations and Warranties of Seller

Seller represents and warrants to Purchaser as follows:

§4.01. Unless otherwise provided in this contract, Seller is the sole owner of the Premises.

§4.02. If the Premises are encumbered by an Existing Mortgage(s), no written notice has been received from the Mortgagee(s) asserting that a default or breach exists thereunder which remains unsured and no such notice shall have been received and remain unsured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended except as shown in such documents.

§4.03. The information concerning written leases (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases (collectively, "Tenancies") as set forth in Schedule E attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract and Rider:

(a) all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b) no renewal or extension options have been granted to tenants;

(c) no tenant has an option to purchase the Premises;

(d) the rents set forth are being collected on a current basis and there are no arrearages in excess of the month for any tenant;

(e) no tenant is entitled to rental concessions or abatements for any period subsequent to the scheduled date of closing;

(f) Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

(g) no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except

with respect to claims involving personal injury or property damage which are covered by insurance; and

(h) there are no security deposits other than those set forth in the Rent Schedule.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04. If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and on the Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise set forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board that have not been complied with by Seller.

§4.05. If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatements as senior citizens, there are no proceedings presently pending before the rent commission in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the rent commission that have not been complied with by Seller.

§4.06. If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affording coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.07. If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employee.

§4.08. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof. Seller has not previously and will not from the date hereof to the date of closing, enter into any collective bargaining agreements.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, but Seller makes no representation as to compliance with any such certificate.

§4.10. The assessed valuation and real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule. Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

*[Handwritten annotations in right margin:]*
free rents or prepaid rents

(h) There are no.

All space at The Premises which is currently is not subject to a lease and will remain vacant.

physically vacant

physically vacant.

There are No service Contracts that will be assumed without Purchaser's consent.

In connection with the assumption on assignment of leases, Purchaser shall seek An estoppel from tenants confirming that there are NO defaults or prepaid or free rents.

*[Handwritten annotations in left margin:]*
MT

NO EXTENSIONS OR OPTIONS OTHER THEN THOSE DIS- "CLOSED IN SCHEDULE E"

RENT ARREARS ARE OPEN ITEM

BROOKLYN CONTRACTS...

MT

§4.12. Seller has no actual knowledge that any incinerator, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

§4.14. Seller is a "foreign person" as defined in the Code Withholding Section.

## Section 5. Acknowledgments of Purchaser

Purchaser acknowledges that:

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the premises "as is" "where is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

## Section 6. Seller's Obligations as to Leases

§6.01. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld: (a) amend, renew or extend any Lease in any respect, unless required by law; (b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or (c) terminate any Lease or Tenancy except by reason of a default by the tenant thereunder.

§6.02. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with (a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and (b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser objects to such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, the rent and additional rent that would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified in Seller's notice and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease to suit the premises to the tenant's occupancy ("Reletting Expenses"), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in

Seller's notice and Purchaser shall pay to Seller, in the manner specified in §2.02, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made by Purchaser to Seller at the Closing. In no event shall the amount so payable to Seller exceed the sums actually paid by Seller on account thereof.

§6.03. If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent. Seller shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04. Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

§6.05. Seller hereby indemnifies and agrees to defend Purchaser against any claims made pursuant to §7-107 or §7-108 of the General Obligations Law (the "GOL") by tenants who resided in the Premises on or prior to the Closing Date other than (a) claims with respect to tenants' security deposits paid, credited or assigned to Purchaser pursuant to §10.03; (b) claims made pursuant to §7-107 of the GOL with respect to funds for which Seller was not liable, and (c) claims made pursuant to §7-108 of the GOL by tenants to whom Purchaser failed to give the written notice specified in §7-108(c) of the GOL within thirty days after the Closing Date. The foregoing indemnity and agreement shall survive the Closing and shall be in lieu of any escrow permitted by §7-108(d) of the GOL, and Purchaser hereby waives any right it may have to require any such escrow.

## Section 7. Responsibility for Violations

§7.01. Except as provided in §7.02 and §7.03, all notices or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this contract and as of the date of closing by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall NOT BE removed or complied with by Seller. Premises shall be delivered free and clear of all claims, liens and taxes pursuant to 11 U.S.C. § 363(b) and (f) and § 1123. Notwithstanding the foregoing, nothing herein shall obligate the Seller to cause any violations or liens to be omitted from Title and Purchaser shall accept such title as Seller may be able to convey, except Seller shall pay all fines and monetary payments associated with the violations or have them omitted from title If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect or complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract as provided in §13.02 if (a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or (b) the Building is a multiple dwelling and either (i) such violation is rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law or (ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.

§7.02. If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right

~~to cancel this contract, in which event the sole liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.~~

§7.03. Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, ~~except that if Purchaser is providing financing by reason of a violation described above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in § 13.02.~~

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

### Section 8. Destruction, Damage or Condemnation

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

### Section 9. Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

~~§9.01. The Existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s).~~

~~§9.02. Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same ? terminable without penalty by the then-owner of the Premises upon not more than 30 days' notice.~~

§9.03. If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereon for no more than one year of those expiring before the Closing.

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06. Seller shall allow Purchaser or Purchaser's representative's access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

### Section 10. Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

§ 10.0 1. A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

§10.02. All Leases initialed by Purchaser and all others in Seller's possession.

~~§10.03. A schedule of all security deposits (and, if the Premises contains six or more family dwelling units, the most recent reports with respect thereto issued by each banking organization in which they are deposited pursuant to GOL §7-103) and a check or credit to Purchaser in the amount of any cash security deposits, including any interest thereon, held by Seller on the Closing Date or, if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash.~~

§10.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05. All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06. An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, insurance policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

~~§10.07. (a) Written consent(s) of the Mortgagee(s), if required under §2.03(b), and (b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s). Seller shall pay the fees for recording such certificate(s). Any Mortgage which is an Institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.~~

~~§10.08. An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).~~

§10.09. All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.11. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12 (a) Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, (b) the Tentative Assessment and Return or Statement of No Tax Due or affidavit (whichever is applicable) and the checks and other items (if any) required under §17.09(a), and (c) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury  Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

~~§10.13. To the extent they are then in Seller's possession, copies of current painting and payroll records. Seller shall make all other Building and tenant files and records available to Purchaser for coping, which obligation shall survive the Closing.~~

§10. 14. An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

~~§10.15. Notice(s) to the Mortgagee(s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.~~

§10.16. If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10.01 shall also contain a recital sufficient to establish compliance with such law.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10. 18. Any other documents required by this contract to be delivered by Seller.

## Section 11. Purchaser's Closing Obligations

At the Closing, Purchaser shall:

§11.01. Deliver to Seller checks in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08.

~~§11.02. Deliver to Seller the Purchase Money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all properly executed, and Purchaser shall pay the mortgage recording tax and recording fees for any Purchase Money Mortgage.~~

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§ 11.05. Deliver any other documents required by this contract to be delivered by Purchaser.

## Section 12. Apportionments

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)  prepaid rents and Additional Rents (as defined in §12.03) and ~~security deposits not transferred to Purchaser;~~

(b) ~~interest on the Existing Mortgage(s);~~  MT

(c)  real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d) ~~wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises~~

~~whose employment was not terminated at or prior to the Closing;~~

(e)  value of fuel stored on Premises, at the price then charged by Seller's supplier, including any taxes;

(f)  charges under transferable Service Contracts or permitted renewals or replacements thereof;

~~(g) permitted administrative charges, if any, on tenant security deposits;~~  MT

(h)  dues to rent stabilization associations, if any;

(i)  insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;

~~(j) Reletting Expenses under §6.02, if any; and~~

(k)  any other items listed in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

~~§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to the month preceding the month in which the Closing occurred; (b) then to the month in which the Closing occurred; (c) then to any month or months following the month in which the Closing occurred; and (d) then to the period prior to the month preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.~~

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing.

## Section 13.  Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien

§13.01. Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. ~~Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or until the expiration date of any written commitment of Purchaser's institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date.~~

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract or if Purchaser shall have any other grounds under this contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey or terminate this contract ~~with a credit against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Downpayment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the net cost of a new survey of the Premises if there was no~~

~~existing survey or the existing survey was not capable of being updated and a new survey was required by Purchaser's Institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one half of one percent of the Purchase Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, other than Existing Mortgages, of which Seller has actual knowledge.~~

§13.03. Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing, if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure both Purchaser and ~~Purchaser's Institutional Lender, if any,~~ that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, ~~unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge,~~ Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

§13.05. Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

## Section 14. Broker

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

## Section 15. Notices

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided.

## Section 16.    Limitations on Survival of Representations, Warranties, Covenants and other Obligations

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action based thereon shall be commenced after the Closing. ~~The representations, warranties, covenants and other obligations of Seller set forth in §4.03, §6.01 and §6.02 shall survive until the Limitation Date specified in Schedule D (or if none is specified, the Limitation Date shall be the date which is six months after the Closing Date), and no action based thereon shall be commenced after the Limitation Date.~~

§16.02. The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

## Section 17. Gains Tax and Miscellaneous Provisions

§17.01. ~~If consent of the Existing Mortgagee(s) is required under §2.03(b),~~ Purchaser shall not assign this contract or its rights hereunder without the prior written consent of Seller, which consent shall not be unreasonably withheld. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee and same is approved by the Bankruptcy Court or Attorney General, as may be required by law. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.04. The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.05. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.06. This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

§17.09. (a) Seller and Purchaser agree to comply in a timely manner with the requirements of Article 31-B of the Tax Law

of the State of New York and the regulations applicable thereto, as the same from time to time may be amended (collectively, the "Gains Tax Law"). Purchaser agrees to deliver to Seller a duly executed and acknowledged Transferee Questionnaire simultaneously with the execution of this contract or within five (5) business days after subsequent written request from Seller or Seller's attorney. At the Closing, Seller shall deliver (i) an official Statement of No Tax Due or (ii) an official Tentative Assessment and Return accompanied by a certified check or official bank check drawn on any banking institution described in §2.02(a), payable to the order of the State Tax Commission in the amount of the tax shown to be due thereon (it being understood, however, that if Seller has duly elected to pay such tax in installments, the amount so required to be paid shall be the minimum installment of such tax then permitted to be paid), or (iii) if applicable, a duly executed and acknowledged affidavit in form permitted under the Gain Tax Law claiming exemption therefrom.

(b)  Seller agrees to (i) to pay promptly any installment(s) or additional tax due under the Gains Tax Law, and interest and penalties thereon, if any, which may be assessed or due after the Closing, (ii) to indemnify and save the Purchaser harmless from and against any of the foregoing and any damage, liability, cost or expense (including reasonable attorney's fees) which may be suffered or incurred by Purchaser by reason of the non-payment thereof, and (iii) to make any other payments and execute, acknowledge and deliver such further documents as may be necessary to comply with the Gains Tax Law.

(c)  If this contract is assignable by Purchaser, no assignment of any rights hereunder shall be effective unless every assignor and assignee complies in a timely manner with the requirements of the Gains Tax Law applicable to the assignment transaction and unless an assignor or assignee delivers to Seller at or before the Closing the applicable items referred to in subparagraph (a) of this Section, all as may be required as a prerequisite to the recording of the deed. In addition to making the payments and delivering the instruments and documents referred to above, Purchaser and any assignor or assignee of this contract shall promptly (i) make any other payments and (ii) execute, acknowledge and deliver such further documents and instruments as may be necessary to comply with the Gains Tax Law.

(d)  Purchaser, if request is made within a reasonable time prior to the Closing Date, shall provide at the Closing a separate certified or official bank check drawn on any banking institution described in §2.02(a) in the amount of the tax shown to be due on the official Tentative Assessment and Return, which amount shall be credited against the balance of the Purchase Price payable at the Closing.

(e)  The provisions of this §17.09 shall survive the delivery of the deed.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written.

Seller: VORAS ENTERPRISE INC.

By:

Purchaser: 679 THROOP ACQUISITION LLC

By:

Receipt by Escrowee

The undersigned Escrowee hereby acknowledges receipt of $_____, by _____, to be held in escrow pursuant to §2.05.

_____
Sperber, Denenberg & Kahan, P.C.

Schedule A
DESCRIPTION OF PREMISES

The Premises are located at or known as:

Street Address:    601-619 Throop Avenue, Brooklyn, New York 11216
                   Block 1856, Lot1

Old Republic National Title Insurance Company

Title Number:   839840(O-NY-OR-KV)

SCHEDULE A
DESCRIPTION

The land referred to in this Certificate of Title is described as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Decatur Street and the easterly side of Throop Avenue;

RUNNING THENCE northerly, along the easterly side of Throop Avenue, 200 feet 0 inches to the southerly side of McDonough Street;

THENCE easterly, along the southerly side of McDonough Street, 40 feet 0 inches;

THENCE southerly parallel with the westerly side of Sumner Avenue, 160 feet 0 inches;

THENCE easterly parallel with the southerly side of McDonough Street, 46 feet 0 inches;

THENCE southerly parallel with the westerly side of Sumner Avenue, 20 feet 0 inches;

THENCE westerly parallel with the northerly side of Decatur Street, 40 feet 0 inches;

THENCE southerly parallel with the westerly side of Sumner Avenue, 80 feet 0 inches to the northerly side of Decatur Street;

THENCE westerly, along the northerly side of Decatur Street, 45 feet 0 inches to the corner above mentioned, the point or place of BEGINNING.

**Schedule B**
**PERMITTED EXCEPTIONS**

1. Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2. Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3. ~~The Existing Mortgage(s) and financing statements, assignments of leases and other collateral assignments ancillary thereto.~~

4. Leases and Tenancies specified in the Rent Schedule be be assumed and assigned to Purchaser in accordance with 11 U.S.C. §365 ~~and any new leases or tenancies not prohibited by this contract.~~   MT *[signature]*

5. Unpaid installments of assessments not due and payable on or before the Closing Date *subject to adjustment as set forth in the Agreement.*

6. Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants.

7. (a) Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights *(i)* imposes any monetary obligation on the owner of the Premises; *and (ii) interferes w/the present use of the Property or structure now on the Property and/or (iii) renders title unmarketable*   MT *[signature]*
   *(iii) prohibits or interferes with the maintenance and operation of any building*

   (b) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

   (c) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

   (d) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto: survey dated March 21, 2012, by Gerald T. O'Buckley, a copy of which is attached hereto as Exhibit H.

Schedule C

PURCHASE PRICE

Purchase Price shall be the sum of : (a) the amount necessary to pay all administrative, professional, priority, secured, and unsecured claims and costs of closing in the Bankruptcy Case in cash, in full, from the proceeds of sale (the "100-cent Plan Amount"); and, (b) the difference between the 100-cent Plan Amount and $12,000,000.00 (the "Charitable Contribution"), but in no event shall the purchase price exceed twelve million and 00/100 ($12,000,000.00) dollars. The Charitable Contribution shall be paid, as a charitable contribution, to Northeast Brooklyn Housing Development Corporation ("NEB"), a 26 U.S.C. §501(c) (3) organization.

The Purchase Price shall be paid as follows:

    (a)  By wire or official bank check, the receipt of which is hereby acknowledged by Seller:                         $1,000,000.00.

    (b)  By wire check or checks delivered to Seller at the Closing in accordance with the provisions of §2.02:             $TBD as per above

    (c)  ~~By acceptance of title subject to the following Existing Mortgage(s):~~

    (d)  ~~By execution and delivery to Seller by Purchaser or its assignee of a note secured by a Purchase Money Mortgage on the Premises, payable as follows:~~

Schedule D

MISCELLANEOUS

1. Title insurer designated by the parties (§1.02):  ANY  TITLE  INSURER  LICENSED  TO  DO
   BUSINESS BY THE STATE OF NEW YORK AS SELECTED BY PURCHASER

2. ~~Last date for consent by Existing Mortgagee(s) (§2.03(b)):~~

3. ~~Maximum Interest Rate of any Refinanced Mortgage (§2.04(b)):~~

4. ~~Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.04(e)):~~

5. Seller's tax identification number (§2.05): TO BE PROVIDED BY SELLER'S ATTORNEY UPON
   REQUEST

6. Purchaser's tax  identification  number  (§2.05):  TO  BE  PROVIDED  BY  PURCHASER'S
   ATTORNEY UPON REQUEST

7. Scheduled time and date of Closing (§3.01): PURSUANT TO THE CONFIRMED CHAPTER 11
   PLAN AND WITHIN THIRTY (30) DAYS OF THE LATER OF THE ENTRY OF (1)
   BANKRUPTCY  COURT  APPROVAL  AND  ENTRY  OF  ORDER  APPROVING  THIS
   TRANSACTION FREE AND CLEAR AND ALL LIENS AND TAXES AND NON-PERMITTED
   ENCUMBRANCES  AND  AFTER  WHICH  ~~OFFER~~  *claims,*  *order* BECOMES  FINAL  AND  NON-
   APPEALABLE CONTAINING INTER ALIA GOOD FAITH PROTECTION UNDER 11 U.S.C. §
   363(m) ; OR, (2) ATTORNEY GENERAL APPROVAL AND  LETTER OF CONSENT WHICH
   BECOMES FINAL AND NONAPPEALABLE, SUBJECT TO ANY WAIVERS.  THIS SALE
   TRANSACTION SHALL NOT BE SUBJECT TO COMPETITIVE BIDDING AND SHALL BE
   PURSUED AS A PRIVATE SALE IN FURTHERANCE OF A PLAN OF REORGANIZATION. *All orders*
   *shall be in form and substance acceptable to Purchaser.* *MT*

8. Place of Closing (§3.01): SELLER'S ATTORNEY, SPERBER, DENENBERG & KAHAN, PC, 48
   W 37TH STREET, 16TH FLOOR, NEW YORK, NEW YORK

9. Assessed valuation of Premises (§4.10):
   Actual Assessment:
   Transition Assessment:

10. Fiscal year and annual real estate taxes on Premises (§4.10):

11. Tax abatements or exemptions affecting Premises (§4. 10):

12. Assessments on Premises (§4.13):

13. Maximum Amount which Seller must spend to cure violations, etc. (§7.02): NOT APPLICABLE,
    $0.00

14. Maximum Expense of Seller to cure title defects, etc. (§13.02): NOT APPLICABLE, $0.00

15. Broker, if any (§14.01): KEEN SUMMIT CAPITAL PARTNERS LLC

16. Party to pay broker's commission (§14.01): SELLER

17. Address for notices (§15.01):
    If to Seller:
    VORAS ENTERPRISE INC.
    C/o Archer & Greiner
    Attn. Allen G. Kadish, Esq.
    630 Third Avenue
    New York, NY 10017

    With a copy to Seller's attorney:
    Seth Denenberg, Esq.

SPERBER DENENBERG & KAHAN, P.C.
48 West 37th Street, 16th Floor
New York, New York 10018

If to Purchaser:
619 THROOP ACQUISITION LLC
 C/o Goldberg Weprin Finkel Goldstein LLP
Attn: Kevin Nash, Esq.
1501 Broadway, 22nd floor
New York, New York 10036

With a copy to Purchaser's attorney:
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Attn: Kevin Nash, Esq.
1501 Broadway, 22nd floor
New York, New York 10036

18.  Limitation Date for actions based on Seller's surviving representations and other obligations (§16.01): NOT APPLICABLE

19.  Additional Schedules or Riders ((§17.08) :
      SCHEDULE E
      RENT SCHEDULE

      SCHEDULE F
      ADDITIONAL RIDER

      SCHEDULE G
      CERTIFICATE OF OCCUPANCY

      SCHEDULE H
      SURVEY

Schedule E

RENT SCHEDULE

| SCHEDULE E - RENT SCHEDULE | | | | | |
|---|---|---|---|---|---|
| NAME | UNIT | RENT | COMMENCEMENT DATE | TERM | SECURITY DEPOSIT |
| Bedford Stuyvesant Family Health Center | A | Initially $58,000 per annum, then as set forth in the Lease. | October 1, 2014 | 60 months with tenant's option to extend for 60 months | $ |
| Metro Urgent Medical Care of Brooklyn PLLC | B | Initially $139,500 per annum, then as set forth in the Lease. | November 21, 2014 | 124 months | $ |
| Brooklyn Legal Services Corporation A | 300 | Initially $141,130 per annum, then as set forth in the Lease. | July 1, 2016 | 24 months with tenant's option to extend for 5 years | $ |
| New Cingular Wireless PCS, LLC | ROOF | $2,750.00 | July 18, 2013 | 5 years with tenant's option to extend for 5 years | |

ARREARS

Brooklyn Legal Services Corp. A          Approximately $30,000.00

Schedule F

RIDER

TO CONTRACT OF SALE

BY AND BETWEEN

VORAS ENTERPRISE INC., AS SELLER

and

619 THROOP ACQUISITION LLC, as Purchaser

Covering Premises Known As:
601-619 Throop Avenue, Brooklyn, New York 11216 (Block 1856, Lot 1).

Dated: **6/28**, 2018

1.      The printed part of this Contract is hereby modified and supplemented.  Wherever there is any conflict between this Rider and the printed part of this Contract, the provisions of this Rider are paramount and the Contract shall be construed accordingly.

2.      This transaction is subject to order of the Bankruptcy Court in case: In Re Voras Enterprise Inc., pending in the United States Bankruptcy Court for the Eastern District of New York under Chapter 11, Case No 1-17-45570 (NHL) approving the sale, which may be the confirmation order.

3.      This transaction is subject to the approval of the New York Attorney General, which shall be pursued simultaneously with confirmation of the Chapter 11 plan and Bankruptcy court approval of this contract.

4.      Said premises are sold subject also to the following:
         (a)      Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable.  For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto: survey dated March 21, 2012, by Gerald T. O'Buckley, a copy of which is attached hereto as Exhibit H.
         (b)      Any and all covenants, restrictions and easements of record, if any;
         (c)      Rights, if any, relating to the construction and maintenance in connection with any public utility of wires, poles, conduits and appurtenances thereto, on, under or across the premises.
         (d)      Real Estate taxes, water rates and sewer rents, subject to adjustment as herein provided.
         (e)      Party Wall Agreement or Sewer agreements, if any.
         (f)      Possible lack of right by any utility company to maintain vaults, coal hole covers, coal chutes and other installations, if any, beyond the building lines.
         (g)      Rent laws and regulations now or hereafter in effect.
         (h)      Violations with any City, State or Federal agency.
         (i)      Existing tenancies and present letting and leases as set forth upon the annexed Schedule E.
         (j)      Standard and printed usual title company exceptions.

5.      Purchaser has inspected the premises or caused an inspection thereof to be made on the Purchasers' behalf, and it is agreed and understood that neither Seller nor any person purporting to act for the Seller has made or now makes any representations or warranties as to the physical condition, income, expense, operation or any other matter or thing affecting or relating to the premises, except as herein specifically set forth.  Purchaser hereby expressly acknowledge that no representations and no warranties except expressly set forth herein have been made and the Purchaser further agree to take the premises "AS IS" "WHERE IS".  Purchaser agrees that Seller is not liable or bound in any manner by any financial statements or written agreements or statements, or representations which have been made, and Real Estate broker's "set-ups" or information pertaining to the premises, furnished by any real estate

broker, agent or employee, servant or other persons, unless the same are specifically stated herein. It is understood and agreed that all understandings and agreements heretofore had between the parties hereto, are hereby merged in this agreement, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation, neither party relying upon any statement or representations made by the Seller or the Purchaser, not embodied in this agreement.

6.      The Seller shall not be required to bring any action or proceeding or otherwise incur any expense to render the title to the premises marketable. The Purchaser agrees to accept such title as the Seller may be able to convey, without reduction of the purchase price or any allowance or credit against the same and without any other liability on the part of the Seller.

7.      The Seller shall not be required to bring any action or proceeding or otherwise incur any expense to clear any violations, including, but not limited to DOB violations, FDNY, sidewalk and ECB violations.  The Purchaser agrees to accept title subject to any violations, without reduction of the purchase price or any allowance or credit against same and without any other liability on the part of the Seller, except if a fine, penalty, assessment or claim has already been entered as of the date of closing they will be paid by Seller.

8.      The Seller will not obtain any permits or certificates of occupancy or certificates of compliance. The Purchaser shall accept title to the Premises with the certificates of occupancy as currently exists, a copy of which is attached hereto as Exhibit G.

9.      The sale does not include Seller's other property including books and records, cash, deposits with third parties, intellectual property, good will, tax attributes, claims and causes of action.        *MT*

10.      Purchaser shall assume and Seller shall ~~Seller in excess $ 5,000~~ assign all commercial leases designated by the Purchaser with any cure payments to be paid by the ~~Purchaser~~. Seller shall not enter into any new leases pending this sale without the Purchaser's written consent.  In the event any tenant fails to comply with the provisions of any lease prior to the title closing, the Seller with Purchaser's consent shall have the right but not the obligation to terminate and cancel said lease by summary proceedings, or otherwise, as provided in any such tenant's lease, and the Purchaser shall accept said premises with or without such lease, as the case may be.  In the event any lease is terminated or canceled by summary proceedings, or otherwise, the Seller, at the time of closing of title hereunder, shall assign to the Purchaser whatever rights the Seller may have against the tenant for any period beyond the date of closing by reasons of such tenant's default.

11.      If any past due rents are owing by any Tenant of the Premises on the Closing Date, the Seller is entitled hereunder to all of said past due rentals adjusted as of the date of closing. Rents as used herein shall mean any Rent and Additional Rent, including CAM charges, as per the respective Leases. Purchaser and Seller agree that the first moneys received by Purchaser and/or Seller, as the case may be, from the respective Tenants owing such past due rentals, shall be applied in the following order of priority: (a) first, to the Seller until such amount due in arrears at the time of closing is collected in full by the Seller; (b) then, to the Purchaser. All such monies received by Purchaser or Seller, as applicable, to which the other party shall be entitled hereunder for such past due rentals shall be held in trust for such other party, and Purchaser or Seller, as applicable, agrees to remit forthwith to such other party the amount of such past due rentals to which such other party is entitled, as and when so collected.  This obligation shall survive the Closing.

12.      The parties further agree that rents due for the month of closing shall be apportioned on a pro-rata basis as and between the parties at the closing based upon the total rent receipts for the month and not solely on the rents actually collected.

13.      Seller represents, to the best of their knowledge, (1) there exists a tenant that is not current on its monthly payment of rent and is in arrears, which arrears remain in default, uncured by the Seller. Seller has sent no notice to the Tenant as of the date hereof. (2) Purchaser has been advised that no security deposits shall be transferred from the Seller to the Purchaser and Purchaser agrees to accept the Leases without the security deposits.

14.      The Downpayment as per Schedule C shall stand as liquidated damages in the event of a failure to close upon or after reasonable extension of a closing date. Any extension of the closing date, not to exceed one (30) day extension, shall be subject to and conditioned upon Purchaser bearing all        *MT*

*by Purchaser*

accruing interest, real estate taxes, and additional costs of Seller, including reasonable attorneys fees, related to the extension period, to be paid promptly upon the closing of title.

15.    Purchaser represents it has the financial means and resources as stated herein to consummate the purchase and Purchaser represents that Purchaser's obligations under the contract are not contingent upon issuance of a written mortgage commitment.

16.    The parties shall bear their respective closing costs and expenses consist with customary practices. To the extent the closing costs or obligations of the Seller are not capable of being paid at closing such costs shall be escrowed or retained upon the agreement of the parties or otherwise as the Court may direct, to be paid promptly as allowed or fixed.

17.    The respective attorneys for the parties are hereby authorized (a) to give any notice which the party is required to give or may give under this Contract and (b) to agree to adjournments of closing. The parties agree that any changes or additions in the within Contract may be initialed by the respective attorneys for the parties with the same force and effect as if initialed by the parties.

18.    Purchaser shall be granted good faith purchaser status pursuant to 11 U.S.C. § 363(m).

19.    Subject to approval, upon written notice from Purchaser delivered to Seller, Seller shall request and use commercially reasonable efforts to cause its secured mortgage holder ("Holder") encumbering the Property (the "Existing Financing") to deliver at Closing an assignment of the Existing Financing to Purchaser's new lender, and further, provided that Purchaser's lender delivers a release in favor of such Seller, releasing such Seller from any obligations under the Existing Financing arising after Closing, in form satisfactory to Seller. Purchaser shall be responsible for all costs associated with such assignment, including reasonable legal fees. Purchaser acknowledges that Seller makes no representation of its ability to deliver an assignment from the Holder, and that, as used herein "commercially reasonable efforts" shall mean a written request by Seller to the Holder. Nothing herein shall require Seller to make any payments or to take any other actions in order to obtain the Holder's agreement to such assignment. Purchaser agrees to indemnify, defend and hold Seller harmless from and against any claims, damages, losses, liabilities, judgments, costs and expenses, including, but not limited to, reasonable attorneys' fees and disbursements incurred by any Seller, arising from the assignment of the Existing Financing thereof, such indemnity to survive the Closing.

20.    The applicable taxes, including, but not limited to, transfer taxes, shall exempt under the Chapter 11 Plan pursuant to 11 U.S.C. § 1146.

21.    Downpayment Escrow Agent:
    (a)    The downpayment in the amount of $1,000,000.00 shall be paid to and held in escrow by *SPERBER DENENBERG & KAHAN, P.C.* *SPERBER DENENBERG & KAHAN, P.C.* is authorized and directed to deposit the downpayment in an IOLA account at Signature Bank located at 565 Fifth Avenue, New York, New York 10017, and shall not be subject to any liability for so doing.
    (b)    Seller and Purchaser hereby Designate *SPERBER DENENBERG & KAHAN, P.C.,* as escrow agent to receive and hold, subject to the provisions of this paragraph, the deposit delivered herewith by Purchaser.
    (c)    Upon the delivery of the deed in accordance with this agreement, *SPERBER DENENBERG & KAHAN, P.C.,* shall promptly deliver the deposit to Seller.
    (d)    *SPERBER DENENBERG & KAHAN, P.C.* shall not be liable to either Seller or Purchaser in connection with its performance as escrow agent hereunder except in the event of gross negligence or willful misconduct.
    (e)    Upon delivery of the deposit to either Purchaser or Seller or a court of competent jurisdiction under and pursuant to the provisions of this paragraph, *SPERBER DENENBERG & KAHAN, P.C.* shall be relieved of all liability, responsibility or obligation with respect to or arising out of the deposit and any and all of its obligations arising therefrom.
    (f)    *SPERBER DENENBERG & KAHAN, P.C.* shall not have any liability or obligation for loss of all or any portion of the deposit by reason of the insolvency or failure of the institution of depository with whom the deposit has been made. The parties acknowledge *SPERBER DENENBERG & KAHAN, P.C.,* present intention to make the deposit with Signature Bank and same is acceptable to the parties.

22.    The acceptance of a deed by the Purchaser herein shall be deemed full compliance by the Seller of all the terms, covenants and conditions of this agreement on the part of the Seller to be

performed, and no claims against the Seller or Purchaser shall survive the closing of title except as otherwise expressly stated herein.

23.    Any and all notices required hereunder shall be given by certified mail, return receipt requested, or sent overnight mail, or delivered in person.

24.    Submission by Seller of this agreement for review and execution by Purchaser shall confer no rights nor impose any obligations on either party until both Seller and Purchaser shall have executed this agreement and duplicate originals hereof shall have been delivered to the respective parties hereto. This Contract shall not be binding on either party until signed and exchanged by both parties.

25.    Seller represents to the best of its knowledge, based upon actual inquiry, but not a Phase I or Phase II survey, that during its period of ownership, that no hazardous substances were caused to exist on the premises nor has Seller received any actual notice of environmental investigations, liabilities, or adverse conditions affecting the Property.

26.    Purchaser shall be permitted reasonable access to the Property, to conduct a Phase I inspection at Purchaser's sole costs and expense upon at least (48) hours' notice to the Seller, but in no event, shall Purchasers conduct of a Phase I inspection, or any subsequent inspection which may result, cause a delay in the closing of title and in no event should any results have an effect on Purchaser's obligation to purchase. Purchaser has agreed to accept the premises "as-is" "where-is" and any result of a Phase I inspection shall be for the Purchasers information only.

Seller: VORAS ENTERPRISE INC.

By: _____

Purchaser: 619 THROOP ACQUISITION LLC

By: _____

Schedule G

CERTIFICATE OF OCCUPANCY


**Buildings**

*Certificate of Occupancy*

Page 1 of 2

**CO Number:** 301043252F

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**  Borough:  Brooklyn

Address:  601 THROOP AVENUE

Building Identification Number (BIN):  3053656

Block Number:  01856

Lot Number(s):  1

Building Type:  Altered

Certificate Type:  Final

Effective Date:  03/22/2001

*For zoning lot metes & bounds, please see BISWeb.*

**B.**  Construction classification:  1-B  (1968 Code)

Building Occupancy Group classification: E  (1968 Code)

Multiple Dwelling Law Classification:  None

No. of stories:  5    Height in feet:  79    No. of dwelling units:  0

**C.**  Fire Protection Equipment:
None associated with this filing.

**D.**  Type and number of open spaces:
None associated with this filing.

**E.**  This Certificate is issued with the following legal limitations:
None

Borough Comments:  None

Acting
Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*



**Buildings**

## *Certificate of Occupancy*

CO Number:    **301043252F**

### Permissible Use and Occupancy

All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations.

| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
|---|---|---|---|---|---|---|
| CEL | | 150 | B-2 | | 6 | STORAGE, BOILER RM, METER RM |
| 001 | 55 | 120 | E | | 6 | |
| 001 | 55 | 120 | E | | 6 | MEDICAL OFFICES,OFFICES |
| 001 | 55 | 120 | E | | 6 | |
| 002 | 65 | 120 | E | | 6 | ENTIRE OFFICE(CORE)VACANT* |
| 003 | 48 | 120 | E | | 6 | OFFICES COMBINED BELOW 613-619 THROOP |
| 004 | 43 | 120 | E | | 6 | OFFICES |
| 005 | 43 | 120 | E | | 6 | OFFICES(*NOTE:THE FOLLOWING FLOOR AREA TO REMAIN UNOCCUPIED UNTIL TENANT IMPROVEMENTS ARE FILED,APPROVED & INSPECTED BY NYC DEPARTMENT OF BUILDINGS:SECOND FLOOR (ENTIRE) |

END OF SECTION

Acting
Borough Commissioner

Commissioner

END OF DOCUMENT

301043252/000  10/26/2011 2:54:51 PM

Schedule H

SURVEY



McDONOUGH STREET

CONCRETE CURB

AVENUE

40'-0"

IRON FENCE ON COPING

CONCRETE SIDEWALK

BOULEVARD

PROJECTIONS ON STREET
6. ROOF CORNICE 2.0'±
7. ORNAMENTAL WORK 1.5'

PROJECTIONS ON STREET
1. TRIMS UP TO 1.3'
2. SILLS UP TO 0.8'
3. STAND PIPE 2.2'
4. WATER TABLE 0.8'
5. LIGHTS 1.8'

685'-0"

ORIGINAL SIZE IN INCHES
0   1   2   3

5 STORY AND CELLAR BRICK #613

100'-0"
( PARALLEL WITH SUMNER AVENUE )

3 STORY AND BASEMENT BRICK #150

YARD

CONCRETE SIDEWALK

CONCRETE CURB

PROJECTIONS ON Street
1. WATER TABLE 1.3'
2. TRIMS 1.3'
3. LIGHTS 1.3'
4. ROOF CORNICE 2.0'
5. SILLS UP TO 0.8'

N

CONCRETE RAMP
AND RAIL

200'-0"

45'-0"
( PARALLEL WITH McDONOUGH STREET )

6'± HIGH BRICK WALL

PENTHOUSE ON
5 STORY
BRICK

PENTHOUSE
5 STORY
BRICK

5 STORY
BRICK

HVAC. UNIT
IN YARD

20'-0"
( PARALLEL WITH SUMNER AVENUE )

6'± HIGH BRICK WALL

40'-0"
( PARALLEL WITH DECATUR STREET )

5 STORY BRICK

5 STORY BRICK

CONCRETE

4 STORY BRICK

4 STORY AND BASEMENT BRICK #798½

TROOP

GRATED AREA

6 STORY BRICK #619

80'-0"
( PARALLEL WITH SUMNER AVENUE )

3 STORY BRICK

BAY OVERHANG

POINT OF BEGINNING

45'-0"

680'-0"

CONCRETE SIDEWALK

STEEL FACE CURB

DECATUR STREET

PROJECTIONS ON STREET
1. ROOF CORNICE 1.5'
2. LIGHT 1.8'
3. STAND PIPE 0.5'
4. TRIMS 0.8'
5. WATER TABLE 0.8'

MARCUS GARVEY ( SUMNER AVENUE/MARCUS GARVEY AVENUE )

DATE SURVEYED: MARCH 21st, 2012
GERALD T. O'BUCKLEY
PROFESSIONAL LAND SURVEYORS AND ENGINEERS

43-14 162nd STREET
FLUSHING, NY 11358
TEL. 718-321-1231
FAX. 718-321-8238

FILED MAP

TAX MAP
SECTION
BLOCK   1856
LOT   1

BOROUGH OF BROOKLYN
COUNTY OF KINGS
STATE OF NEW YORK

CERTIFIED TO:
FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK

NOTES:
1. THIS SURVEY WAS DONE FOR FIRST AMERICAN TITLE INSURANCE COMPANY AND IS INTENDED TO BE USED FOR TITLE PURPOSES ONLY.
2. NO GUARANTEE IS IMPLIED BY THIS MAP AS TO THE EXISTENCE OR NONEXISTENCE OF ANY EASEMENTS OF RECORD THAT WOULD AFFECT SUBJECT PROPERTY, UNLESS SURVEYOR HAS BEEN FURNISHED WITH A COMPLETE COPY OF TITLE REPORT.
3. THIS MAP WAS MADE AT A SCALE OF 1" = 16' WHEN ORIGINALLY DRAWN.
4. PROPERTY CORNER MONUMENTS WERE NOT PLACED AS PART OF THIS SURVEY.
5. IT IS A VIOLATION OF THE STATE EDUCATION LAW FOR ANY PERSON, UNLESS ACTING UNDER THE DIRECTION OF A LICENSED LAND SURVEYOR TO ALTER AN ITEM IN ANY WAY.
6. THIS IS TO CERTIFY THAT THERE ARE NO VISIBLE STREAMS NOR NATURAL WATER COURSES IN THE PROPERTY EXCEPT AS SHOWN ON THIS SURVEY.
7. ONLY COPIES FROM THE ORIGINAL OF THIS SURVEY MARKED WITH AN ORIGINAL OF THE LAND SURVEYOR'S EMBOSSED SEAL SHALL BE CONSIDERED TO BE VALID TRUE COPIES.

Gerald T. O'Buckley

GERALD T. O'BUCKLEY, P.L.S.
NEW YORK LICENSE 039834

**Exhibit 5.1(c)**

**Projected Sources and Uses**

| In re Voras Enterprise Inc. Chapter 11 Case No. 17-45570 Schedule of Claims/Proposed Uses on Sale (Estimates/Assumptions) | |
|---|---|
| **SOURCES** | |
| Implementation Funds (per Contract of Sale and Plan) [Purchase Price + Charitable Contribution = $12 Million] | |
| | |
| **USES** | **Projected as of August 31, 2018** |
| Pre-Petition Tax Certificates held by MTAG Services, LLC | $177,806.10 |
| Pre–Petition Mechanics Lien held by New York Design Architects, LLP | $48,085.14 |
| New York City Water Board [New York City Department of Environmental Protection] | $49,000.00 |
| New York City Office of Administrative Trials and Hearings | $5,819.75 |
| New York City Department of Finance | $200,767.02 |
| Fire Department Summons | $29,476.77 |
| 124 NY Inc Payoff Amount | $8,125,910.63 |
| | |
| Office of the U.S. Trustee Quarterly Fee | $110,000.00 |
| Archer & Greiner, P.C.  (Counsel) | $550,000.00 |
| Keen-Summit Capital Partners Real Estate Advisory Fee (5% of $12,000,000.00) | $600,000.00 |
| Sperber Denenberg & Kahan, P.C. (Special Real Estate Counsel) | $13,000.00 |
| | |
| IRS | $13,438.61 |
| | |
| Con Ed | $56,232.02 |
| Imperial Fire Protection Systems | $22,238.94 |
| **APPROXIMATE SUBTOTAL =** | $10,001,774.98 |
| | |
| NEBHDCo | $940,269.56 |
| **APPROXIMATE TOTAL =** | **$10,942,044.54** |

*PROJECTED ALLOWED CLAIMS; ALL RIGHTS RESERVED; ALL NUMBERS ARE ESTIMATES SUBJECT TO VERIFICATION AND RECONCILIATION AS OF CLOSING.*

## **Exhibit 5.2**

**All rights of action are preserved post-Effective Date including the following:**

| Potential Defendant: | Summary Description |
|---|---|
| Donaldson & Chilliest, LLP | The Debtor preserves the right to pursue an action against its former professionals for breach of the duty to provide skillful and competent representation, causation, and resulting financial loss. |
| Brooklyn Legal Corporation A | The Debtor preserves the right to pursue and defend itself in a landlord/tenant dispute regarding non-payment of rent. |
| State of New York - Tax Certiorari | The Debtor preserves the right to challenge all real property assessments on its Building, located at 601-619 Throop Avenue, Brooklyn, New York 11233. |

214515066v10